**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW CHAMLIN, individually and on behalf of all others similarly situated, <br><br>                Plaintiff, <br><br>     v. <br><br> JOHNSON & JOHNSON and McNEIL NUTRITIONALS, LLC <br><br>             Defendants. | Civil Action No. 1:19-cv-03852-AJN-DCF |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTFF'S
MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS
<u>REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL</u>**

Dated:  August 14, 2020

**BURSOR & FISHER, P.A.**

Scott A. Bursor
Joseph I. Marchese
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com
           jmarchese@bursor.com

**BURSOR & FISHER, P.A.**

Frederick J. Klorczyk III
Neal J. Deckant
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  fklorczyk@bursor.com
          ndeckant@bursor.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

PAGE(S)

I. INTRODUCTION ................................................................... 1

II. PLAINTIFF'S CLAIMS ARE SUSCEPTIBLE TO COMMON PROOF ...................... 6

    A. Common Evidence Shows That Benecol Contains Trans Fat ................... 6

    B. Common Evidence Shows That The No Trans Fat Claims Are False And Misleading ................................................................ 7

    C. The No Trans Fat Claims Are Material To Consumers ...................... 9

III. THE REQUIREMENTS OF FED. R. CIV. P. 23(A) ARE MET .................... 11

    A. Numerosity ............................................................. 11

    B. Commonality ........................................................... 11

    C. Typicality ............................................................ 12

    D. Adequacy .............................................................. 13

    E. The Classes Are Ascertainable ........................................ 14

IV. THE REQUIREMENTS OF RULE 23(B)(3) ARE MET ........................... 15

    A. Common Questions Of Law Or Fact Predominate ......................... 16

        1. Common Questions Of Fact Predominate ............................ 16

        2. Common Questions of Law Predominate As To Plaintiff's Claims Under New York Gen. Bus. Law §§ 349 & 350 ............ 16

        3. Common Questions Of Law Predominate As To Plaintiff's New York Unjust Enrichment Claim .................................. 19

        4. Common Questions Of Law Predominate As To Plaintiff's Fraud And Negligent Misrepresentation Claims ..................... 19

    B. Damages Are Measurable On A Classwide Basis .......................... 21

    C. Class Litigation Is Superior To Other Methods of Adjudication ........ 22

V. CONCLUSION ................................................................. 24

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) .......................................................................................... 23

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013) ..................................................................................... 16

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000) ............................................................................... 13

*Citibank, N.A. v. Walker*,
  12 A.D.3d. 480 (N.Y. App. Div. 2d Dep't 2004) .............................................. 19

*Consol. Rail Corp. v. Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) ............................................................................... 11

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. 2014) ................................................................ passim

*Fogarazzao v. Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ...................................................................... 12

*Ge v. Pinnacle Performance Ltd.*,
  2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) .............................................. 20, 21

*Goldemberg v. Johnson & Johnson Cons. Cos., Inc.*,
  317 F.R.D. 374 (S.D.N.Y. 2016) ...................................................................... 15

*Guido v. L'Oreal, USA, Inc.*,
  284 F.R.D. 468 (C.D. Cal. 2012) ...................................................................... 18

*Hart v. BHH, LLC*,
  2017 WL 2912519 (S.D.N.Y. July 7, 2017) .......................................... 14, 20, 23

*Hasemann v. Gerber Prod. Co.*,
  331 F.R.D. 239 (E.D.N.Y. 2019) ................................................................... 5, 17

*Hasemann v. Gerber Prod. Co.*,
  2019 WL 2250687 (E.D.N.Y. Feb. 20, 2019) ................................................... 15

*Hawkins v. Kroger Co.*,
  906 F.3d 763 (9th Cir. 2018) ......................................................................... 2, 3, 7

*In re Initial Pub. Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ............................................................................... 14

*In re Petrobas Sec.*,
   862 F.3d 250 (2d. Cir. 2017) ................................................................. 14

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) ............................................. 12, 14, 17

*In re Scotts EZ Seed Litig.*,
   2017 WL 3396433 (S.D.N.Y. Aug. 8, 2017) ......................................... 22

*In re Scotts EZ Seed Litig.*,
   2018 WL 1274965 (S.D.N.Y. Mar. 5, 2018) ........................................ 22

*Jermyn v. Best Buy Stores, L.P.*,
   256 F.R.D. 418 (S.D.N.Y. 2009) ................................................... 17, 19

*Leider v. Ralfe*,
   387 F. Supp. 2d 283 (S.D.N.Y. 2005) ................................................ 17

*Makaeff v. Trump University, LLC*,
   2014 WL 688164 (S.D. Cal. Feb. 21, 2014) ....................................... 18

*Mandarin Trading Ltd. v. Wildenstein*,
   16 N.Y.3d 173 (2011) ......................................................................... 19

*Mantikas v. Kellogg Co.*,
   910 F.3d 633 (2d Cir. 2018) ................................................................. 7

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997) ............................................................... 11

*Martinelli v. Johnson & Johnson*,
   2019 WL 1429653 (E.D. Cal. Mar. 29, 2019) ............................. passim

*Maurizio v. Goldsmith*,
   230 F.3d 518 (2d Cir. 2000) ............................................................... 17

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002) ................................................. 16, 20, 21

*Noble v. 93 Univ. Place Corp.*,
   224 F.R.D. 330 (S.D.N.Y. 2004) ........................................................ 15

*Postlewaite v. McGraw-Hill*,
   333 F.3d 42 (2d Cir. 2003) ............................................................. 9, 10

*Price v. L'Oreal USA, Inc.*,
   2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018) .................................... 18

*Reid v. Johnson & Johnson*,
    780 F.3d 952 (9th Cir. 2015) .................................................................. passim

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ............................................................................. 21

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ............................................................................. 12

*Rodriguez v. It's Just Lunch, Int'l*,
    300 F.R.D. 125 (S.D.N.Y. 2014) ......................................................... 19, 20, 23

*Seijas v. Republic of Argentina*,
    606 F.3d 53 (2d Cir. 2010) ............................................................................... 23

*Sykes v. Mel S. Harris and Assocs., LLC*,
    780 F.3d 70 (2d Cir. 2015) ............................................................................... 22

*Vaccaro v. Bank of Am., N.A.*,
    2016 WL 4926201 (S.D.N.Y. Sept. 15, 2016) ................................................. 9

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ..................................................................................... 11

*Washington v. New York City Dep't of Educ.*,
    2018 WL 3342324 (2d Cir. July 9, 2018) ......................................................... 8

**STATUTES**

28 U.S.C. App. at 141 ........................................................................................... 21

New York Gen. Bus. Law § 349 .................................................................... passim

New York Gen. Bus. Law § 350 .................................................................... passim

**RULES**

Fed. R. Civ. Rule 23 ....................................................................................... 14, 21

Fed. R. Civ. P. 23(a)(1) ....................................................................................... 11

Fed. R. Civ. P. 23(a)(2) ....................................................................................... 11

Fed. R. Civ. P. 23(a)(3) ....................................................................................... 12

Fed. R. Civ. P. 23(a)(4) ....................................................................................... 13

Fed R. Civ. P. 23(b)(3) ..................................................................................... Passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(b)(3) Advisory Committee's Note to 1966 Amendment ............................... 21

W. Rubenstein, Newberg on Class Actions § 4:54 at 205 (5th ed. 2012) ................................... 21

Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1781 ........................................................... 21

## I.    INTRODUCTION

This is a simple case concerning the false labeling and sale of the Benecol Regular and Benecol Light Spreads (collectively, "Benecol" or "Benecol Spreads") as having "No Trans Fat." The case is ideally suited for class treatment.  Indeed, in 2019, District Judge Morrison England certified a multi-state class of consumers who filed similar claims in a companion case arising from Benecol's false and misleading "No Trans Fat" claim.  *See Martinelli v. Johnson & Johnson*, No. 2:15-CV-01733-MCE-DB, 2019 WL 1429653, at *5 (E.D. Cal. Mar. 29, 2019).

Defendants Johnson & Johnson ("J&J") and McNeil Nutritionals, LLC ("McNeil") (collectively, "Defendants") manufactured and sold the Benecol Spreads as an alternative to butter and margarine.  From January 1, 2008 through December 31, 2011,[1] every tub of Benecol sold claimed "No Trans Fat" and "No Trans Fatty Acids" (together, the "No Trans Fat" claim).[2] Klorczyk Decl. Ex. A at McNeil0000006; *id.* Ex. B at McNeil0000023; *id.* Ex. C.  The packaging reinforced Benecol's purported heart-healthy message by associating it with a heart image immediately adjacent to the No Trans Fat claim, set forth in bold type and all capital letters:

---

[1] The labeling for the Benecol spreads changed in September 2011, at which point the "No Trans Fat" and "No Trans Fatty Acid" representations were removed from the labeling.  As Benecol's Assistant Brand Manager, Sean Belke, testified, the Benecol units with the changed labels first appeared on store shelves after 2011.  *See* Klorczyk Decl. Ex. D, Belke Dep. at 137:3-15 ("Q: When was the labeling change executed? … A:  I do not know when it was executed.  Q:  Was it after 2011?  A:  Executed?  After 2011.  Q:  What does it mean to execute a labeling change? A:  The way I'm describing it to be on shelf.").  Thus, every tub of Benecol on store shelves through 2011 was labeled with the No Trans Fat claim.

[2] "Trans fat" and "trans fatty acids" are synonymous.  *See* Klorczyk Decl., Ex. E, Steele Dep. at 47:24-48:2 ("Q:  Is it your understanding that the terms trans fat and the term trans fatty acids refer to the same thing?  A:  Yes."); *see also id*. Ex. H ("*trans* fatty acid … also referred to as '*trans* fat'").



*Id.*; *see also* Klorczyk Decl. Ex. D, Belke Dep. at 87:16-19.  Despite the ubiquitous label claim, however, the Benecol Spreads contained trans fat due to their use of partially hydrogenated soybean oil as an ingredient.  *See infra* § II.A.

Consumption of trans fat poses a serious health risk linked to coronary heart disease and an increase in bad cholesterol levels.  Indeed, the Ninth Circuit has held "falsely advertising that a food product does not contain trans fat is a health hazard."  *Hawkins v. Kroger Co.*, 906 F.3d 763, 772 (9th Cir. 2018).  Benecol's brand manager, Sean Belke, testified that trans fats are "a worse fat than other fats."  Klorczyk Decl. Ex. D, Belke Dep. at 26:19-27:1.  The FDA has repeatedly warned about the adverse impact of trans fat on heart health in general, and on cholesterol levels in particular.  This is because trans fats raise "bad" cholesterol levels.  Even in 1999, research "showed that consumption of diets containing trans fatty acids, like diets containing saturated fats, <u>results in increased serum low-density lipoprotein cholesterol (LDL–C),[3] a major risk factor for C[oronary] H[eart] D[isease]</u>" (or "CHD").  Klorczyk Decl. Ex. G at

---

[3] There are two types of cholesterol:  LDL-C and HDL-C.  LDL-C is considered the "bad" cholesterol.  Trans fat increases serum LDL–C ("bad" cholesterol), and reducing trans fat intake reduces coronary heart disease ("CHD") risk.  Klorczyk Decl. Ex. G at 41467.  As the FDA further noted, "<u>[a]lthough the effect of trans fat on LDL-C ['bad' cholesterol] and CHD risk is the primary basis for trans fat labeling, trans fat may also increase CHD risk by lowering high-density lipoprotein cholesterol (HDL-C) ('good' cholesterol)</u>."  *Id.* (emphasis added).

41435 (emphasis added); *id.* at 41442-49 (analyzing scientific evidence concerning the consumption of trans fatty acids); *see also* Klorczyk Decl. Ex. H at 34663 ("Our conclusion that there is a linear relationship … between trans fat intake and CHD risk is consistent with the body of evidence from controlled feeding studies on the proportionality of fatty acid intake and blood lipids …"). Since 2003, the FDA has therefore maintained that

> Consumers must know – and the agency believes is material information that the reasonable consumer should know – the amount of *trans* fat in food products that they select as part of their total daily diet to choose products that would allow them to reduce their intake of *trans* fat, and thus, reduce the risk of CHD.
>
> …
>
> Consumers would be misled without having *trans* fat information available on the label.

Klorczyk Decl. Ex. G at 41438 (emphasis added). Due to the serious health risks posed by trans fat, ███████████████████████████████████████████████████████

████████ as of September 2009. Klorczyk Decl. Ex. GG, MCNEIL-CHAM-000001562-64.[4]

During the class period, "No Trans Fat" appeared five separate times on Benecol's packaging, while "No Trans Fatty Acids" appeared twice. Klorczyk Decl. Ex. A at McNeil0000006; *id.* Ex. B at McNeil0000023; *id.* Ex. C. It was on the tub. It was on the lid. It was on the outer sleeve, not just once but three times – on the front, back, and top – written in all capitalized, bolded letters. In total, No Trans Fat and No Trans Fatty Acids appeared in seven

---

[4] At deposition, Susan Chamlin, the Plaintiff's wife, testified about her awareness of Mayor Michael Bloomberg's efforts to ban trans fat in New York City, and also about her desire to avoid trans fat due to its health risks. *See also* Klorczyk Decl. Ex. EE, Susan Chamlin Dep. at 36:22-38:18 ("Q:  Did you learn about that from any other source?  A:  There was a great deal of information that was out publicly and Bloomberg was spouting all kinds of information about trans fat.  I think they were considered illegal to use through his efforts and it was in the news a great deal.  Q:  And when was that in the news a great deal from Bloomberg?  A:  I believe that it was in the early 2000s.  Probably, I don't know, '6, '7.  2006, '7, something like that.").

different places.  Klorczyk Decl. Ex. D, Belke Dep. at 100:2-101:5 (explaining that the claims appeared seven times); *id.* at 107:3-21 (confirming that the same representations appeared on Benecol Light); *see also* Klorczyk Decl. Ex. F, Zeno Dep. at 80:2-86:3.  The only part of the retail packaging that did not reference the No Trans Fat claim was the bottom.  *See* Klorczyk Decl. Ex. E, Steele Dep. at 100:7-12.

The No Trans Fat claim is straightforward and absolute.  Laura Zeno, a Benecol Assistant Brand Manager, agreed that it can only mean that Benecol "contains no trans fat."  *See* Klorczyk Decl. Ex. F, Zeno Dep. at 125:20-23; *id.* at 130:22-131:20 ("Q:  Is there any other meaning you can think of other than the fact that the product purportedly carries no trans fat that the logo conveys to you?  …  A:  No.").  Benecol's brand manager, Sean Belke, put it best:

> Q:    But if you saw the claim that said no trans fatty acid, you
>       would think there's absolutely none of those in the product
>       either, correct?
>
>       …
>
> A:    If it says no, yeah.
>
> Q:    So in your opinion, the word no means absolutely not
>       present, correct?
>
> A:    Yeah.

Klorczyk Decl. Ex. D, Belke Dep. 33:10-21.  The No Trans Fat claim is therefore binary – it is either true or false.  *See id.* at 70:15-21 ("Q:  Is the no trans fat claim a binary claim?  …  A:  What do you mean by binary?  Q:  It's true or not, correct?  …  A:  It's true or not, yeah.").

As explained below, the Ninth Circuit already determined that Benecol's "statement ['No Trans Fat'] is not true" against these same Defendants.  *Reid v. Johnson & Johnson*, 780 F.3d 952, 967 (9th Cir. 2015).  Thus, Defendants are collaterally estopped from re-litigating this issue. *See* § II.B, *infra*.  Moreover, Defendants have admitted that the Benecol Spreads contained trans

4

fat in deposition testimony and written discovery.  *See* §II.A, *infra*.  And, in Judge England's

opinion, any arguments by Defendants that they complied with FDA regulations "are not well

taken."  *Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at *5 (E.D. Cal. Mar. 29, 2019);

*see also Reid v. Johnson & Johnson*, 780 F.3d 952, 962-63 (9th Cir. 2015) ("But, as noted,

claims required on a nutrition label under section 101.9(c), like Benecol's '0 grams trans fat per

serving' claim, are not nutrient content claims and thus are not covered by section 101.13(b)(4)'s

synonym rule.  That McNeil must say Benecol contains 0 grams of trans fat per serving on its

nutrition label makes no difference here.").

Plaintiff brings claims for violation of New York Gen. Bus. Law ("GBL") §§ 349 and

350, unjust enrichment, negligent misrepresentation, and fraud.  Judge England not only certified

three of these claims on behalf of a California class, but he also certified claims under

California's consumer protection statutes which, like New York's GBL, utilize a reasonable

consumer standard.  *See Martinelli,* 2019 WL 1429653 (certifying claims for express warranty,

implied warranty of merchantability, unjust enrichment, negligent misrepresentation, fraud, and

California's consumer protection statutes, the CLRA, UCL, and FAL); *Hasemann v. Gerber

Prod. Co.*, 331 F.R.D. 239, 266 (E.D.N.Y. 2019) ("[T]o prevail ... under GBL §§ 349 and 350,

the plaintiff must prove that the defendant made misrepresentations ... that were likely to mislead

a reasonable consumer in the plaintiff's circumstances, that the plaintiff was deceived by those

misrepresentations ... and that as a result the plaintiff suffered injury.").

Here, Plaintiff seeks to certify and represent the following class:

> All persons who purchased Benecol Regular Spread or Benecol
> Light Spread from January 1, 2008 to December 31, 2011 in New
> York (the "New York Class").[5]

---

[5] As explained at length in Plaintiff's opposition to Defendants' motion to dismiss, the statutes of
limitations for Plaintiff's and the Class's claims were tolled by the *Reid*, *Martinelli*, and *Bowling*

## II.   PLAINTIFF'S CLAIMS ARE SUSCEPTIBLE TO COMMON PROOF

### A.   Common Evidence Shows That Benecol Contains Trans Fat

Partially Hydrogenated Oils ("PHOs") "are the primary dietary source of industrially-

produced *trans* fatty acids."  Klorczyk Decl. Ex. H at 34650.  Defendants admit Benecol

contained partially hydrogenated soybean oil from the product's inception.  Elizabeth Steele,

Director of Strategic Planning for McNeil and a 30(b)(6) witness for Defendants, confirmed this

at her deposition:

> Q:   Did the defendants design the formulations for the Benecol
>       spreads intentionally to include some amount of trans fat
>       per serving?
>
>       …
>
> A:   So the partially hydrogenated soybean oil was part of, from
>       my conversation, was part of the original formula, so that
>       was in the product from the beginning.  …

Klorczyk Decl. Ex. E, Steele Dep. at 168:3-15; *see also id.* at 140:1-9, 149:13-16.

████████████████████████████.  *Id.* at 155:19-156:9, 157:9-20.  ████████████████

████████████████████████████   *See id.* at 145:11-146:1, 151:3-8, 156:2-7,

157:15-25; *see also* Klorczyk Decl. Ex. I at McNeil0015809 (Regular); *id.* at McNeil0015814

(Light); *id.* Ex. J at McNeil0019297 (Light); *id.* at McNeil0019303 (Regular).  These PHOs were

the source of trans fat in Benecol:

> Q:   Did the partially hydrogenated soybean oil that was used to
>       make the Benecol spreads contain trans fats?
>
>       …
>
> A:   So that ingredient partially hydrogenated soybean oil is the
>       trans fat for the Benecol spreads.

---

matters, and are further subject to equitable tolling.  *See generally* 11/6/19 Motion to Dismiss
Opposition (Dkt. 29).

> Q:     There is trans fat in Benecol regular spread and in Benecol
>        light spread, right?
>
> A:     That ingredient is in the Benecol spreads, yes.

Klorczyk Decl. Ex. E, Steele Dep. 74:20-75:13; *see also id.* at 149:21-150:4; Klorczyk Decl. Ex.

F, Zeno Dep. 138:4-18.  As a result, ███████████████████████████████████████████

███████████████████████████████   *See* Klorczyk Decl. Ex. FF, 4/27/20 Interrogatory Response

Nos. 3-4.

### B.     Common Evidence Shows That The No Trans Fat Claims Are False And Misleading

Defendants admit in their interrogatory responses and deposition testimony that ███████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████   Klorczyk Decl. Ex. FF,

4/27/20 Interrogatory Response No. 4; *see also* Klorczyk Decl. Ex. E, Steele Dep. 74:20-75:13

("A:  [P]artially hydrogenated oils are trans fats. … A:  [P]artially hydrogenated soybean oil is

the trans fat for the Benecol spreads.").

The Ninth Circuit has already "held that [Benecol's] 'No Trans Fat' [claim] was

misleading because a reasonable consumer might infer that the product did not contain trans fat."

*Hawkins*, 906 F.3d at 771 (citing *Reid v. Johnson & Johnson*, 780 F.3d 952, 962-63 (9th Cir.

2015)).  Moreover, the Second Circuit has held that information listed on the side or rear of food

packaging cannot cure misleading claims on the front of the packaging.  *See Mantikas v. Kellogg

Co.*, 910 F.3d 633, 637 (2d Cir. 2018) ("We conclude that a reasonable consumer should not be

expected to consult the Nutrition Facts panel on the side of the box to correct misleading

information set forth in large bold type on the front of the box.").  Thus, Benecol's product

packaging and Defendant's discovery responses are common evidence supporting Plaintiff's

claims of false and deceptive advertising:

> It is clear, however, that Benecol's label prominently states that Benecol contains "No Trans Fat." <u>That statement is not true.</u> Although Benecol may contain a relatively small amount of trans fat per serving, the FDA found that the existing scientific evidence was not sufficient for it to approve "No Trans Fat" claims. <u>Despite this finding, McNeil made such a claim.</u> Given that the FDA has indicated in warning letters that claims like "No Trans Fat" are not authorized, McNeil cannot shield itself from liability with the FDA's regulations.

*Reid v. Johnson & Johnson*, 780 F.3d 952, 967 (9th Cir. 2015) (emphasis added).

The Ninth Circuit's conclusion that Benecol's "No Trans Fat" claim is "not true" is

binding against Defendants. "The doctrine of collateral estoppel bars re-litigation of a legal or

factual issue that was previously decided where: '(1) the issues in both proceedings are identical,

(2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a]

full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated

was necessary to support a valid and final judgment on the merits.'" *Washington v. New York

City Dep't of Educ.*, 2018 WL 3342324, at \*2 (2d Cir. July 9, 2018) (internal citation omitted).

<u>First</u>, whether Benecol's No Trans Fat claims were authorized by FDA regulations is

identical to the issue decided in *Reid*. In *Reid*, Defendants identified one of the issues on appeal

as whether "Appellant's claims [are] preempted by the Food, Drug and Cosmetic Act … and

regulations of the United States Food and Drug Administration ('FDA'), as the District Court

ruled, because they seek to impose disclosure and labeling requirements that are different from

those required by federal law?" Klorczyk Decl. Ex. M at 2.

<u>Second</u>, Defendants had a full and fair opportunity to litigate this issue in *Reid* and in fact

did so. Both J&J and McNeil were the defendants in *Reid* and were represented by the same

counsel as they previously were in the *Bowling* matter.  *See Reid*, 780 F.3d at 955 ("Robert Reid appeals the district court's decision dismissing his false advertising lawsuit against Johnson & Johnson and McNeil Nutritionals, LLC (collectively, 'McNeil')."); *id.* ("Mollie F. Benedict, and Amanda Villalobos, Tucker Ellis LLP, Los Angeles, CA, for Defendants-Appellees.").

Finally, this issue was actually litigated and decided in *Reid*.  As the Ninth Circuit explained, "[t]he preemption analysis of the 'No Trans Fat' claim turns on whether the statement is authorized by FDA regulations."  *Reid*, 780 F.3d at 959.  As such, this issue was "necessarily decided" for purposes of collateral estoppel.  *See Vaccaro v. Bank of Am., N.A.*, 2016 WL 4926201, at *5 (S.D.N.Y. Sept. 15, 2016) ("The requirement that the issue in question be necessarily decided in the previous case, however, does not mean that the prior decision must 'have been explicit ... if by necessary implication it is contained in that which has been explicitly decided.'" (quoting *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003)).  Since the Ninth Circuit's decision that Benecol's No Trans Fat claim was not authorized by the FDA was the basis for overturning the District Court's dismissal of the plaintiff's claims in *Reid*, it was necessary to support a valid and final judgment on the merits.

### C.   The No Trans Fat Claims Are Material To Consumers

The "No Trans Fat" and "No Trans Fatty Acids" claims on every unit of Benecol sold during the Class Period were directed at consumers.  Klorczyk Decl. Ex. D, Belke Dep. at 90:23-91:7 ("Q:  This is representing a factual attribute about the Benecol spread, correct?  …  A:  Which, the no trans fat?  Q:  Yes.  A:  Yes.  Q:  That representation was directed to your consumers, correct?  …  A:  It's on the product labeling, so yes.").  Indeed, the claims were omnipresent, appearing 7 times on each unit's packaging.  The No Trans Fat claim differentiated Benecol from competitors.  *See* Klorczyk Decl. Ex. F, Zeno Dep. at 229:9-14 ("Q: What is your definition of a differentiated product given your experience professional and academic in

marketing?  A:  It's typically the sum of many parts, brand equity the product delivers, packaging, advertising.").

Plaintiff's consumer survey expert, J. Michael Dennis, Ph.D., conducted a consumer perception survey, in part to determine whether the No Trans Fat claim was material to consumers.  *See* 8/13/20 Declaration of J. Michael Dennis, Ph.D. ("Dennis Decl.") ¶ 15.  As Dr. Dennis found, the No Trans Fat claim was "substantially material to class members" in that "purchasers are almost 14 times more likely to favor a cholesterol-lowering spread <u>with</u> the 'No Trans Fat' label over a product <u>without</u> the 'No Trans Fat label' (i.e., 88.9% compared to 6.4%)." *Id.* ¶ 17 (emphasis in original).  "Moreover, in a survey question about purchasers' understanding of the challenged claims, two out of three purchasers believe the labels 'No Trans Fat' and 'No Trans Fatty Acids' to mean the product 'Does <u>not</u> contain any Trans Fat.'  In contrast, less than one in five expect such a labeled product to 'Contain a small amount of Trans Fat.'" *Id.* (emphasis in original).  These results are corroborated by Defendants' document production.  For instance, as one Benecol employee observed in September 2009, ███████████████ ████████████████████████████████████████████████████████████████

Klorczyk Decl. Ex. GG, MCNEIL-CHAM-000001562-64 (emphasis added).

Plaintiff Chamlin's understanding of the "No Trans Fat" claim comports with the understanding of the two-thirds majority of Dr. Dennis's consumer survey respondents.  *See* 8/11/20 Matthew Chamlin Decl. ¶ 4-5 ("I understood that the 'No Trans Fat' claim on the Benecol Spreads packaging to mean that the products did not contain any trans fat at all.").  Furthermore, Plaintiff Chamlin repeatedly stated that "[t]he 'No Trans Fat' claim was really important to [him], and [he] would not have purchased the Benecol Spreads if [he] knew the product contained trans fat."  *See id.* ¶ 7. (quoting Klorczyk Decl. Ex. DD, Matthew Chamlin

10

Dep. at 48:13-15).

## III.     THE REQUIREMENTS OF FED. R. CIV. P. 23(A) ARE MET

### A.     Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A presumption of numerosity attaches to classes of more than 40 in the Second Circuit. *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). The Class easily satisfies this requirement. ███████████████████████████ ██████████████████████████████████████ 8/14/20 Declaration of Colin B. Weir ("Weir Decl.") Table 1. Thus, the numerosity requirement is easily satisfied. *See Martinelli*, 2019 WL 1429653, at *6 (finding "the class is so numerous that joinder of all members of both classes is impracticable" where ███████████████████████████ ██████████").

### B.     Commonality

Commonality is met "if there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In other words, Plaintiff's and Class members' claims "depend on a common contention," "capable of class-wide resolution … meaning that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). The commonality requirement is met where the individual circumstances of class members differ, but "their injuries derive from a unitary course of conduct by a single system." *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). "Even a single question of law or fact common to the members of the class will satisfy the commonality requirement." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2562.

Where, as here, a plaintiff challenges false and misleading product labeling, the commonality requirement is routinely satisfied. *See, e.g., Ebin v. Kangadis Food Inc.*, 297

F.R.D. 561, 565 (S.D.N.Y. 2014) (holding that a common question in a consumer class action brought under the GBL is whether the defendant olive oil distributor defrauded purchasers by claiming that its product constituted "100% Pure Olive Oil"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) (holding that a common question is whether a product claim promising thicker grass growth is false or misleading).  As Judge England already explained:

> Here, every class member has the same basic claim—they purchased Benecol because of statements on the product's packaging and those statements were false.  …  Resolution of this common claim depends on a critical common question of fact: whether Defendants' statements were in fact false. Indeed, the Ninth Circuit found the "no trans fat" claim to be false. *Reid*, 780 F.3d at 967.  As Plaintiff explains, answering this common question of fact "will resolve an issue that is central to the validity of each one of the claims in one stroke."  ….  Accordingly, the Court finds the requirement of commonality is met.

*Martinelli*, 2019 WL 1429653, at *6 (internal citations omitted).

## C.   Typicality

Rule 23(a)(3) requires Plaintiffs' claims to be "typical" of the class.  Fed. R. Civ. P. 23(a)(3).  "The typicality requirement is not demanding."  *Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).  Typicality is satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).

Where, as here, "it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id.* at 936-37.  As discussed above, the same unlawful conduct – the false and deceptive No Trans Fat claim – was directed at each class member.  *See supra* § II.C.  Plaintiff purchased Benecol Spreads based on the presumed truth of the "No Trans Fat" claim on the front and top of

12

the product packaging.  *See* Matthew Chamlin Decl. ¶ 4-7; *see also* Klorczyk Decl. Ex. DD,

Matthew Chamlin Dep. at 29:5:17 ("[W]e made the decision based on the label.").  The lead

plaintiff's and absent class members' claims arise from the same course of events, and each class

member will make similar legal arguments to prove defendants' liability.  *See* Matthew Chamlin

Decl. ¶ 11.  Thus, the plaintiff and all of the class members will marshal the same evidence and

arguments in support of their claims.  *See Martinelli*, 2019 WL 1429653, at *6 (finding typicality

satisfied).

     **D.**    **Adequacy**

     Adequacy requires that "the representative parties will fairly and adequately protect the

interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Generally, adequacy of representation entails

inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of

the class and 2) plaintiff's attorneys are qualified, experienced, and able to conduct the

litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

Both of these factors are met here.

     Plaintiff intends to fairly and adequately represent the interests of the class.  Matthew

Chamlin Decl. ¶¶ 8-10.  Since Plaintiff's individual and class claims arise from Benecol's

uniformly false and misleading No Trans Fat packaging claims, he seeks remedies equally

applicable and beneficial to the class.  *Id.* ¶ 8.  Plaintiff has no conflicts of interest with the

proposed class and has demonstrated his commitment to pursue these claims by providing

allegations for inclusion in the Complaint (which he reviewed prior to the filing), by responding

to written discovery and testifying at a full-day deposition, and by consulting periodically with

counsel to review, discuss, determine, and participate in the actions to be taken in pursuit of this

case on behalf of all class members.  *Id.* ¶¶ 9-10.

Plaintiff's counsel, Bursor & Fisher, P.A., are experienced and qualified class action lawyers who have experience litigating consumer claims like the ones at issue here.  The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries in 6 of 6 class action jury trials since 2008.  *See* Klorczyk Decl. Ex. O, Bursor & Fisher, P.A. Firm Resume.  Other courts in this district have already recognized the qualifications of Plaintiffs' counsel in appointing them as class counsel in similar consumer class actions.  *See Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. 2014) (Rakoff, J.) ("As for plaintiffs' counsel, Bursor & Fisher, P.A. are class action lawyers who have experience litigating consumer claims … The firm has been appointed class counsel in dozens of cases in both federal and state courts."); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 407 (S.D.N.Y. 2015) (Briccetti, J.) (same); *Hart v. BHH, LLC*, 2017 WL 2912519, at *6 (S.D.N.Y. July 7, 2017) (Pauley, J.) ("The first prong is easily dispensed with in view of the undersigned counsel's work in similar consumer product class actions in this district … This Court therefore finds that Bursor & Fisher, P.A., is qualified, experienced, and able to conduct this litigation.").  Moreover, Plaintiff's counsel is also court-appointed Class Counsel in the *Martinelli* action.

### E.    The Classes Are Ascertainable

Though it does not appear in the text of Rule 23, courts in this circuit have recognized an "implied requirement of ascertainability."  *Ebin*, 297 F.R.D. at 566-67 (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006)).  "The ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobas Sec.*, 862 F.3d 250, 264 (2d. Cir. 2017) (rejecting the argument that proposed classes must be "administratively feasible" and holding that the class was "clearly objective" and "sufficiently definite" where it included people who

14

acquired specific securities during a specific period in "domestic transactions" because the class was "identified by subject matter, timing, and location," which made it "objectively possible" to ascertain members).

Although an effort to identify class members must be made "at some point in the case," there is no requirement that any class members, other than the named class representatives, be identified prior to class certification. *See, e.g.*, *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 341-42 (S.D.N.Y. 2004) (internal quotations and citations omitted).

Here, the Class is defined objectively such that Class Members can be identified by reference to "objective criteria." Members of the New York Class consist of individuals who purchased Benecol in New York from 2008 to 2011. The nature, location, and timing of the purchase are objective facts. Thus, it is objectively possible to ascertain Class Members by reference to these criteria. Accordingly, the ascertainability requirement is met even though class members may not possess receipts or other documentation evidencing their purchases. *See Ebin*, 297 F.R.D. at 567 (finding nationwide class of olive oil purchasers ascertainable even though they were unlikely to have proof of purchase); *Goldemberg v. Johnson & Johnson Cons. Cos., Inc.*, 317 F.R.D. 374, 398 (S.D.N.Y. 2016) ("[D]enial of class certification in consumer protection cases like these on the basis of ascertainability would severely contract the class action mechanism"); *Hasemann v. Gerber Prod. Co.*, 2019 WL 2250687, at *18 (E.D.N.Y. Feb. 20, 2019), *report and recommendation adopted as modified*, 331 F.R.D. 239 (E.D.N.Y. 2019) ("[T]o require such documentation, then, would be to foreclose many of the claims best-suited to class treatment.").

## IV.   THE REQUIREMENTS OF RULE 23(B)(3) ARE MET

Rule 23(b)(3) authorizes class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Both are met here such "that certification is proper under Rule 23(b)(3)".  *Martinelli*, 2019 WL 1429653, at *7.

### A.    Common Questions Of Law Or Fact Predominate

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  Notably, Rule 23(b)(3) calls only for "a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).

### 1.    Common Questions Of Fact Predominate

Plaintiff's central allegation is that the No Trans Fat and No Trans Fatty Acids claims are false and misleading because Benecol contains trans fat and trans fatty acids.  *See supra* §§ I-II.  Accordingly, the determination of the following common questions of fact will resolve issues central to the validity of Plaintiff's and Class Members' claims in a single stroke:  (1) whether Defendants labeled and advertised Benecol as containing "No Trans Fat" and "No Trans Fatty Acids;" (2) whether these labeling claims were material to Class Members' decision to purchase Benecol; (3) whether Benecol does in fact contain trans fat or trans fatty acids; and (4) whether Class Members were damaged by purchasing Benecol that contained trans fat or trans fatty acids notwithstanding the label claims to the contrary.  Each of these questions can be answered with common evidence as described above.

16

     2.       **Common Questions of Law Predominate As To Plaintiff's Claims Under New York Gen. Bus. Law §§ 349 & 350**

Common questions of law also predominate with respect to Plaintiff's claims under New York Gen. Bus. Law §§ 349 and 350 that he brings on behalf of himself and the New York Class. To establish a prima facie case under § 349, a plaintiff must demonstrate that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). "Deceptive acts" are defined objectively as those that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 522; *see also Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005). "The same analysis applies to claims brought under Section 350." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015). Additionally, neither Section 349 nor 350 require proof of reliance … nor proof that defendants intended to mislead consumers. *Id.* at 409 (citations omitted).

Plaintiff alleges that Benecol's misrepresentations (i) were directed at consumers, (ii) were false or misleading in a material way, and (iii) caused injury to Plaintiff. *See* Class Action Complaint, Dkt. No. 1 ("Compl.") ¶¶ 62-84. Plaintiff will prove these claims with the same common evidence described above, including the Defendants' uniform misrepresentation on the product packaging during the class period; Defendants' documents, testimony and admissions regarding trans fat content; and Defendants' documents and expert discovery regarding materiality of the "No Trans Fat" claim and damages. *See Hasemann*, 331 F.R.D. at 274 ("Cases analyzing both FDUTPA and GBL claims support a finding that false advertising claims under both statutes meet the predominance requirement," and also noting that "class members will be able to use generalized proof to make out their claims, including proof of deception, falsity, and pricing decisions."); *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418,

435-36 (S.D.N.Y. 2009) (certifying GBL §§ 349 and 350 claims where "[t]he predominant issue before the Court is whether Best Buy's advertisements about its price match guarantee were false and misleading because the company had a secret Anti-Price Matching Policy."); *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 480-83 (C.D. Cal. 2012) (certifying class under GBL §§ 349 and 350 where all purchasers of hair product were subject "to the same deceptive marketing and advertising"); *Makaeff v. Trump University, LLC*, 2014 WL 688164, at *14 (S.D. Cal. Feb. 21, 2014) ("Based on the same showing of the UCL claims, the Court concludes common issues predominate for alleged violations of New York General Business law.").

Indeed, the fact that these statements appeared prominently on the packaging 7 times – on every side except the bottom – is evidence in itself of their materiality.  *See, e.g., Ebin*, 297 F.R.D. at 568 (certifying class under GBL § 349 where "every class member saw the same representation that Capatriti was '100% Pure Olive Oil' because the statement appeared in large letters on the front, back, left, right, and top of the tin.  …  The same generalized evidence will be used to establish whether Capatriti's label is false, and if so, whether it was likely to mislead a reasonable consumer acting under the circumstances.").  Finally, the materiality of the No Trans Fat claim is confirmed by Dr. Dennis's consumer perception survey which found the No Trans Fat claim was material to two-thirds of respondents.  Dennis Decl. ¶ 17; *Price v. L'Oreal USA, Inc.*, 2018 WL 3869896, at *9 (S.D.N.Y. Aug. 15, 2018) ("[C]ommon evidence such as an experimental study can shed light on the question of materiality.").  Dr. Dennis's finding of materiality is corroborated by his conjoint study, which verified that Benecol commanded a 20.8% price premium that was solely attributable to the No Trans Fat claim.  *Id.* ¶ 18.  As Judge England recognized in denying Defendants' motion to exclude Dr. Dennis, "District courts have recognized conjoint analysis as a generally accepted method for valuing the individual

characteristics of a product, and have certified classes where plaintiffs used conjoint analysis." *Martinelli*, 2019 WL 1429653, at *4 (internal quotations omitted).

### 3.   Common Questions Of Law Predominate As To Plaintiff's New York Unjust Enrichment Claim

Common questions of law predominate with respect to Plaintiff's unjust enrichment claim that he brings on behalf of himself and the New York Class.  *See* Compl. ¶¶ 57-61.  New York law requires proof "that (1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'"  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (alteration in original) (quoting *Citibank, N.A. v. Walker*, 12 A.D.3d. 480, 481 (N.Y. App. Div. 2d Dep't 2004)).  "The essential inquiry in any action for unjust enrichment … is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  *Id*. (internal citation omitted).  This claim is therefore susceptible to common proofs described above and should be certified on behalf of the New York Class.  *See Jermyn*, 256 F.R.D. at 436 ("But, for the same reasons articulated for the section 349 claim, the Court believes that 'common questions of law and fact will continue to predominate because it does not appear that any such [individual] issues would be unique to each plaintiff.' … The predominant issue for the unjust enrichment claim is whether Best Buy was enriched at the class' expense by using an undisclosed policy of aggressively discouraging and denying customers' valid price match requests."); *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 148 (S.D.N.Y. 2014) ("Moreover, in every case cited by the parties involving section 349 and unjust enrichment claims arising out of the same core facts in which the court granted certification of the section 349 claim, the court also granted certification of the unjust enrichment claim.").

4.      **Common Questions Of Law Predominate As To Plaintiff's Fraud And Negligent Misrepresentation Claims**

Common questions of law also predominate with respect to Plaintiff's claims for negligent misrepresentation and fraud that he brings on behalf of himself and the New York Class.  *See* Compl. ¶¶ 85-97.  As Judge Pauley explained in certifying a nationwide fraud class:

> The "Second Circuit has held that the predominance requirement is met for claims sounding in fraud that are based on uniform representations made to all members of the class."  *Ebin*, 297 F.R.D. at 569 (citing *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002)) ("Fraud actions must ... be separated into two categories: fraud claims based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations.  The former are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof.").  Many elements of a fraud claim – misrepresentation, reliance, and causation – are easily addressed through generalized proof of the product's label and proof of plaintiffs' purchases.

*Hart*, 2017 WL 2912519, at *8 (S.D.N.Y. July 7, 2017).  As Judge Pauley further explained, "the elements of fraud are generally the same" and that "[p]roving knowledge and intent to deceive, while subject to varying standards in certain states, can be addressed on a classwide basis."  *Id.*  Indeed, "'many courts in this Circuit … have held that reliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations … about that product.'"  *Rodriguez*, 300 F.R.D. at 139 (quoting *Ge v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013)).

Here, Defendants knowingly and purposely lied about the presence of trans fat in a product that was target-marketed to people concerned about their heart health and cholesterol.  This is true even though trans fat poses serious health hazards for someone with heart health or cholesterol issues.  *See supra* § I.  Nonetheless, Defendants affixed the "No Trans Fat" claim to every side of Benecol's packaging except the bottom, while including trans fat-containing

ingredients in the product formulation from day one. *See id.* This action is therefore an

"appropriate subject[] for class certification because the standardized misrepresentations may be

established by generalized proof." *Moore*, 306 F.3d at 1253. Indeed, it is impossible that Class

Members did not rely on Defendants' misrepresentation as it was omnipresent on the product

packaging. *See, e.g.*, Matthew Chamlin Decl. ¶¶ 4, 7. Once again with respect to the claims for

fraud and negligent misrepresentation, the same common evidence detailed above will determine

Defendants' liability with respect to all class members.

## B.    Damages Are Measurable On A Classwide Basis

When issues of liability can be determined with classwide evidence, the predominance

standard is generally satisfied even if damages are not provable in the aggregate. *See* Fed. R.

Civ. P. 23(b)(3) Advisory Committee's Note to 1966 Amendment ("[A] fraud perpetrated on

numerous persons by the use of similar misrepresentations may be an appealing situation for a

class action, and it may remain so despite the need, if liability is found, for separate

determination of the damages suffered by the individuals within the class."); *Roach v. T.L.

Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (denial of class certification inappropriate

"simply because damages cannot be measured on a classwide basis"); Wright, Miller, & Kane,

Fed. Prac. & Proc. Civ. § 1781, at 235-37; W. Rubenstein, Newberg on Class Actions § 4:54 at

205 (5th ed. 2012) ("[I]ndividual damage[s] calculations should not scuttle class certification

under Rule 23(b)(3)").

Moreover, damages calculations in this case are straightforward. Plaintiff's central

allegation is that the No Trans Fat claim is false and misleading because Benecol contains trans

fat. *See supra* § I. Since Benecol was a premium priced product, *see* Klorczyk Decl. Ex. F,

Zeno Dep. at 171:9-15, Plaintiff's measure of damages rests on the fact that a certain percentage

of the price consumers paid for Benecol constituted a price premium solely attributable to the No

Trans Fat claim.  Weir Decl. ¶¶ 42-44; *see also* Klorczyk Decl. Ex. CC, MCNEIL-

CHAM000000253-54 ███████████████████████████████████████  Based on

his conjoint survey,[6] Dr. Dennis concludes that the "price premium attributable to the 'No Trans

Fat' claim is 20.8% … That is, $1.00 of the $4.80 price paid by purchasers of Benecol Spreads

is attributable to the 'No Trans Fat' claim."  Dennis Decl. ¶¶ 18, 49.  Using the 20.8% premium

calculated by Dr. Dennis, Mr. Weir calculates damages with the following formula: "% Price

Premium Factor: Claim x $Units Sold = Damages."  Weir Decl. ¶ 52.

Additionally, Plaintiff's claims under GBL §§ 349 & 350 provide for statutory damages

of $50 and $500 per violation, respectively.  The Second Circuit has held that "[i]t is not

disputed that statutory damages under GBL § 349 can be assessed on the basis of common proof,

as they are capped at $50."  *Sykes v. Mel S. Harris and Assocs., LLC*, 780 F.3d 70, 87 (2d Cir.

2015); *see also In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *18 (S.D.N.Y. Aug. 8, 2017)

("Because statutory damages are available for the New York class in this case, the damages

calculation for the New York class may be proved on a class-wide basis."), *reconsideration*

*denied by In re Scotts EZ Seed Litig.*, No. 12 CV 4727 (VB), 2018 WL 1274965 (S.D.N.Y. Mar.

5, 2018).  Here, using Defendant's sales records, Mr. Weir has calculated statutory damages

using the following formula "Number of Units Sold x Damages per Violation = Total Statutory

Damages."  Weir Decl. ¶¶ 55-57.

### C. Class Litigation Is Superior To Other Methods of Adjudication

Finally, a class action is the superior method of adjudication.  Rule 23(b)(3) provides four

factors for the Court's consideration:

> (A) [T]he interest of members of the class in individually
> controlling the prosecution or defense of separate actions; (B) the

---

[6] Laura Zeno agrees that a conjoint survey can be used to "assess which product attributes carry a price premium."  Klorczyk Decl. Ex. F, Zeno Dep. at 176:1-16.

> extent and nature of any litigation concerning the controversy
> already commenced by or against members of the class; (C) the
> desirability or undesirability of concentrating the litigation of the
> claims in the particular forum; and (D) the difficulties likely to be
> encountered in the management of the class action.

Fed. R. Civ. P. 23(b)(3).  All four of these factors favor class treatment here.

Where proceeding individually would be prohibitive due to the minimal recovery, "the class action device is frequently superior to individual actions."  *See Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).  Here, the average price for a tub of Benecol was $4.80.  The relatively small amount at issue for each Class Member renders individual litigation infeasible, but a class action offers the potential for meaningful redress to the Class.  As Judge England held, "it would be unfeasible for many of the purported class members to obtain relief on an individual basis.  Therefore, the proposed class action is the superior method of resolving this dispute, and the Court finds that the requirements of Rule 23(b)(3) are met."  *Martinelli*, 2019 WL 1429653, at *8.  The same conclusion should be reached here.  *See Rodriguez*, 300 F.R.D. at 141 ("[G]iven the relatively modest amount of monetary damages for each individual plaintiff at issue, the Court finds that the class members have little interest in controlling the litigation individually because it would be prohibitively expensive related to the expected recovery.") (citations omitted); *Hart*, 2017 WL 2912519, at *9 (S.D.N.Y. July 7, 2017) (finding superiority requirement was satisfied where "the cost of bringing a lawsuit substantially outweighs the cost incurred in purchasing a defective pest repeller"); *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (emphasizing that the policy "at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive" for individuals to bring claims).  Moreover, this case is manageable as a class action because liability will be established predominantly through the common classwide evidence.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his motion

for class certification in its entirety.


Dated:  August 14, 2020                              Respectfully submitted,

                                                     **BURSOR & FISHER, P.A.**

                                                     By:     */s/ Joseph I. Marchese*
                                                                 Joseph I. Marchese

                                                     Scott A. Bursor
                                                     Joseph I. Marchese
                                                     888 Seventh Avenue, Third Floor
                                                     New York, NY 10019
                                                     Telephone: (646) 837-7150
                                                     Facsimile:  (212) 989-9163
                                                     E-Mail: scott@bursor.com
                                                             jmarchese@bursor.com

                                                     **BURSOR & FISHER, P.A.**

                                                     Frederick J. Klorczyk III
                                                     Neal J. Deckant
                                                     1990 North California Blvd., Suite 940
                                                     Walnut Creek, CA 94596
                                                     Telephone: (925) 300-4455
                                                     Facsimile:  (925) 407-2700
                                                     E-Mail:  fklorczyk@bursor.com
                                                             ndeckant@bursor.com

                                                     *Attorneys for Plaintiff*