# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MATTHEW CHAMLIN, individually and on behalf of others similarly situated,

        Plaintiff,

  v.

JOHNSON & JOHNSON and McNEIL NUTRITIONALS, LLC,

        Defendants.

Case No. 1:19-cv-03852-AJN-DCF

**DEFENDANTS JOHNSON & JOHNSON AND McNEIL NUTRITIONALS, LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERTS J. MICHAEL DENNIS AND COLIN WEIR**

Dated: September 25, 2020

**O'MELVENY & MYERS LLP**
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Counsel for Defendants Johnson & Johnson and McNeil Nutritionals, LLC*

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. OVERVIEW OF CONJOINT ANALYSIS AND DENNIS'S SURVEYS ...................... 3

III. ARGUMENT ...................................................................................................... 5

    A. Dennis's Alleged Conjoint Analysis Is Incapable of Estimating a "Price Premium" ........................................................................................... 5

        1. Dennis Does Not Consider What Consumers Actually Paid .................... 6

        2. Dennis Measures Only Consumer Demand, Not Market Prices ............... 8

    B. Dennis's Survey Methodology Is Defective and Unreliable ............................. 12

        1. Dennis Surveyed the Wrong Universe of Consumers ........................... 12

        2. The Implausible Partworths and Price Premiums that Dennis Calculated Make No Sense and Defy Basic Economic Principles .......... 14

        3. Dennis's Conjoint Survey Measured How Respondents Value Obscure Features That Do Not Drive Real-Life Consumer Purchases ................................................................................... 16

        4. Dennis's "Consumer Perceptions" Survey Is Too Detached from Reality to Measure Anything Meaningful about Materiality ................. 17

    C. Weir's Report Is Inadmissible For Multiple Reasons ......................................... 19

        1. Weir's Endorsement of Dennis's Conjoint Analysis Is Inadmissible ...... 19

        2. Weir Is Not Qualified to Testify on Retail Pricing, and His Opinions on That Subject Are Unreliable ........................................... 22

        3. Weir's "Damages Calculation" Is Basic Multiplication ......................... 24

IV. CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
   2010 WL 5186393 (D. Utah Dec. 15, 2010) ................................................ 14

*Amorgianos v. Amtrak*,
   303 F.3d 256 (2d Cir. 2002) ......................................................................... 1

*Apple, Inc. v. Samsung Elecs. Co.*,
   2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ............................................ 9, 17

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
   920 F. Supp. 2d 475 (S.D.N.Y. 2013) ........................................................ 21

*Beaty v. Ford Motor Co.*,
   2020 WL 639408 (W.D. Wash. Feb. 11, 2020) ............................................ 8

*Bouygues Telecom, S.A. v. Tekelec*,
   472 F. Supp. 2d 722 (E.D.N.C. 2007) ........................................................ 20

*Bowling v. Johnson & Johnson*,
   2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019) ............................................... 7

*Cincinnatus Partners I, LP v. Farm Bureau Prop. & Cas. Ins. Co.*,
   2014 WL 12748899 (S.D. Ohio May 28, 2014) .......................................... 25

*Columbia Grain, Inc. v. Hinrichs Trading, LLC*,
   2015 WL 6675538 (D. Idaho Oct. 30, 2015) .............................................. 22

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
   650 F. Supp. 2d 314 (S.D.N.Y. 2009) ........................................................ 12

*Cumberland Packing Corp. v. Monsanto Co.*,
   140 F. Supp. 2d 241 (E.D.N.Y. 2001) ........................................................ 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ..................................................................................... 21

*Duran v. Henkel of Am., Inc.*,
   2020 WL 1503456 (S.D.N.Y. Mar. 30, 2020) .............................................. 6

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
   301 F. Supp. 2d 612 (S.D. Tex. 1903) ....................................................... 11

*F.H. Krear & Co. v. Nineteen Named Trs.*,
   810 F.2d 1250 (2d Cir. 1987) ..................................................................... 20

*Gutierrez v. Wells Fargo & Co.*,
   2010 WL 1233810 (N.D. Cal. Mar. 26, 2010) ............................................. 6

*Hartle v. FirstEnergy Generation Corp.*,
   7 F. Supp. 3d 510 (W.D. Pa. 2014) ............................................................ 20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) ...................................................... 20, 21

*In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*,
2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ............................................ 12

*In re Gen. Motors LLC Ignition Switch Litig. ("In re GM")*,
427 F. Supp. 3d 374 (S.D.N.Y. 2019) ........................................ 1, 8, 10, 11

*In re NJOY, Inc. v. Consumer Class Action Litig.*,
120 F. Supp. 3d 1050 (C.D. Cal. 2015) ...................................................... 9

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
45 F. Supp. 3d 724 (N.D. Ohio 2014) ........................................................ 22

*Jones Creek Investors, LLC v. Columbia County*,
2013 WL 12141348 (S.D. Ga. Dec. 23, 2013) .......................................... 25

*Jordache Enters., Inc. v. Levi Strauss & Co.*,
841 F. Supp. 506 (S.D.N.Y. 1993) ............................................................ 12

*Koppell v. N.Y. State Bd. of Elections*,
97 F. Supp. 2d 477 (S.D.N.Y. 2000) ......................................................... 24

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) ..................................................................................... 1

*Martinelli v. Johnson & Johnson et al.*,
No. 2:15-cv-01733-MCE-DB (E.D. Cal.) .................................................... 2

*Orlander v. Staples, Inc.*,
802 F.3d 289 (2d Cir. 2015) ........................................................................ 6

*Price v. Fox Ent. Grp., Inc.*,
499 F. Supp. 2d 382 (S.D.N.Y. 2007) ....................................................... 20

*Reinsdorf v. Skechers U.S.A.*,
922 F. Supp. 2d 866 (C.D. Cal. 2013) ...................................................... 16

*Saavedra v. Eli Lilly & Co.*,
2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ...................................... 9, 17

*Schechner v. Whirlpool Corp.*,
2019 WL 4891192 (E.D. Mich. Aug. 13, 2019) ......................................... 8

*Schwartz v. Fortune Magazine*,
193 F.R.D. 144 (S.D.N.Y. 2000) .............................................................. 25

*Scott v. Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016) ................................................................ 25

*Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*,
398 B.R. 564 (Bankr. E.D. Mich. 2008) ................................................... 25

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*THOIP v. Walt Disney Co.*,
690 F. Supp. 2d 218 (S.D.N.Y. 2010) ...................................................... 12

*Tunis Bros. Co. v. Ford Motor Co.*,
124 F.R.D. 95 (E.D. Pa. 1989) .............................................................. 20

*United States v. Madison*,
226 F. App'x. 535 (6th Cir. 2007) ......................................................... 25

*Universal City Studios, Inc. v. Nintendo Co.*,
746 F.2d 112 (2d Cir. 1984) ................................................................. 12

*Visteon Global Techs., Inc. v. Garmin Int'l, Inc.*,
2016 WL 5956325 (E.D. Mich. Oct. 14, 2016) .................................. 9, 17

*Zaremba v. Gen. Motors Corp.*,
360 F.3d 355 (2d Cir. 2004) ................................................................. 24

**Other Authorities**

*Reference Manual on Scientific Evidence* 376 n.76 (3d ed. 2011) ............................. 12

Smart Balance, https://www.smartbalance.com/buttery-spreads-sticks/smart-balance-
original .................................................................................................. 13

Stop & Shop, https://stopandshop.com/pages/about-us (Stop & Shop acquired by Royal
Ahold NV in 1996) ................................................................................ 24

**Rules**

Fed. R. Evid. 702 ................................................................................................ 24

## I.   <u>INTRODUCTION</u>

In support of his Motion for Class Certification, Plaintiff proffers the declarations of two experts: J. Michael Dennis and Colin Weir. Dennis opines on two surveys he conducted: (1) a "conjoint" survey that he contends can be used to calculate classwide damages; and (2) a "consumer perceptions" survey that he contends proves the materiality of the allegedly misleading claims. Weir opined that the survey results could be used to calculate classwide damages.  Because all these opinions rest on "expertise that is *fausse* and science that is junky," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J., concurring), the Court should exclude them. When, as here, "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," the opinion must not go to a jury: instead, "*Daubert* and Rule 702 ***mandate*** the exclusion of that unreliable opinion testimony." *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002) (emphasis added).

***First****,* Dennis's conjoint analysis has no basis in statistics, marketing science, or economics. Outside the litigation context, conjoint experts warn against doing exactly what Dennis purports to do here. Dennis says his conjoint analysis measures the "price premium" that represents class members' overpayment for Benecol. But conjoint analysis ***does not—and cannot—measure overpayment*** because it neither accounts for what buyers actually paid nor does it measure what they should have paid in a hypothetical world without the alleged deception. Although class members paid a wide range of prices for Benecol, Dennis assumes they all paid the exact same price. And although market prices reflect both supply and demand, Dennis's analysis ignores supply entirely. As Judge Furman recently explained in detail and at length, such a conjoint analysis does not measure overpayment injury as a matter of law. *See In re Gen. Motors LLC Ignition Switch Litig.* ("*In re GM*"), 427 F. Supp. 3d 374, 388–89 (S.D.N.Y. 2019)*.* Dennis's conjoint survey flouts the laws of supply and demand and should be excluded for that reason alone.

**Second**, Dennis's surveys are riddled with methodological defects that are so fundamental and extensive that they render the results unreliable, irrelevant, and therefore inadmissible. Both surveys sample the wrong population and are invalid for that reason alone. In addition, the conjoint survey collected data that are so nonsensical that they expose the artifice of Dennis's methodology and the unreliability of his purported "price premium." And the "consumer perceptions" survey is so contrived and biased that it says nothing about why consumers buy Benecol or how they understand the Benecol labels.

**Third**, Weir's opinions are also inadmissible. First, he vouches for Dennis's conjoint analysis without conducting any independent analysis of his own, and for that reason is unnecessarily cumulative, unhelpful to the trier of fact, and conclusory. Second, Weir's testimony about retail pricing reflects a complete lack of knowledge and experience in modern retail pricing strategy. And third, Weir's calculation of "overpayment damages" through basic multiplication is unhelpful and does not constitute expert testimony.

Doubtless, Plaintiff will argue that Judge England denied *Daubert* motions directed at substantially identical reports from Dennis and Weir in *Martinelli v. Johnson & Johnson et al.*, No. 2:15-cv-01733-MCE-DB (E.D. Cal.). Though Dennis's and Weir's reports are similar, the record and this Motion are not. This Court should not follow Judge England's decision for at least *five* reasons that were not presented to the court in *Martinelli*:

1. since the *Martinelli* decision, Defendants have elicited **admissions** from Dennis and Weir that demonstrate their opinions are unreliable and inadmissible;

2. Judge England decided Defendants' motion to exclude without the benefit of ***In re GM***, in which Judge Furman systematically dismantled the proposition that a conjoint like Dennis's could measure overpayment injury, *see* Section III.A.2;

3. Professor David Reibstein, a luminary in the conjoint field, explains why Dennis's conjoint analysis is scientifically unsound, including that on its own terms it is ***incapable*** of measuring a "premium" at any price other than $4.80, *see* Section

III.B.2, and that the underlying conjoint data reflect a broken design that conjures absurd results, Section III.B;

**4.**     retail pricing expert Edward Fox demonstrates that Weir is not only unqualified to opine on modern retail pricing mechanisms, but his opinions here are simply bunk, *see* Section III.C; and

**5.**     retail pricing data show that **real-world prices of Benecol remained flat both before and after the challenged label was removed** in December 2011, thus exposing the lie of Dennis's purported 20% "price premium," *see* Section III.C.2;

Because none of the testimony offered by Dennis and Weir is reliable or scientifically valid, they should be excluded under Federal Rules of Evidence 403 and 702.

## II.     OVERVIEW OF CONJOINT ANALYSIS AND DENNIS'S SURVEYS

Conjoint analysis is a survey-based statistical technique that aims to determine consumers' relative preferences for different product features.[1] Survey respondents are presented with "choice sets" of hypothetical products that have different combinations of features chosen by the survey designer. *See* Ex. 20 ¶¶ 35, 45.[2] For each "choice set," respondents indicate which product they prefer; implicitly, their choices indicate what product features each respondent values over others. *Id.* ¶ 35. Those survey responses are translated into "partworth utilities," which place a number on each respondent's valuation of each product feature. All the survey respondents' partworths are then entered into a computer simulation that purports to estimate how consumers might behave in the marketplace. *Id.* ¶ 36; Ex. 15 at 70:21–72:10.

Dennis purports to use conjoint analysis not to measure relative value between features but to measure, in dollars, respondents' exact willingness to pay for a feature—specifically, their willingness to pay for a Benecol label that says "No Trans Fat." He conducted a survey on about

---

[1] *See* Declaration of J. Michael Dennis in Support of Class Certification ("Dennis Decl.") ¶¶ 29–30; Rebuttal Expert Report of David Reibstein ("Reibstein Decl.") ¶ 44.
[2] Exhibit numbers refer to those attached to the concurrently filed Declaration of Hannah Y. Chanoine.

500 respondents who claimed to have purchased any kind of heart-healthy spread. Dennis Decl. ¶ 25. Dennis showed respondents a description of three hypothetical cholesterol-lowering spreads, each with a different combination of five features: tub size, percentage of vegetable oil, type of supplemental ingredient, label descriptions, and price. *Id.* ¶¶ 26, 31, 35–39; Ex. 15 at 70:13–20. The "label description" category itself showed a combination of multiple statements, including "No Trans Fat" and "No Trans Fatty Acids." Dennis Decl. ¶¶ 39–40. Respondents were told to "assume that each product in the conjoint is 'just like the cholesterol-lowering spread that you usually buy in these ways: Taste, Consistency and Texture, and How It Cooks.'" *Id.* ¶ 31. Respondents chose to "purchase" one of the three hypothetical products that were shown, or none of them. *Id.* ¶ 26 & Att. C at 47. Respondents repeated this choice task twelve times, with each task involving three hypothetical products with a different combination of features. *Id.* ¶ 29; Ex. 15 at 70:13–20.

Dennis used the survey data to calculate what he calls a "partworth utility" for each respondent, assigning a numerical value for each of the tested product attributes that purportedly reflects how much each respondent valued that attribute. Dennis Decl. ¶ 42; Ex. 15 at 70:21–71:25. Dennis then fed each individual respondent's partworth information into a "market simulation tool." Dennis Decl. ¶ 42. Dennis ran only one simulation, using $4.80 as the starting price, to calculate the prices at which an equal number of respondents would choose (a) a hypothetical cholesterol-lowering spread with a "No Trans Fat" label and (b) an otherwise identical cholesterol-lowering spread without a "No Trans Fat" label, which Dennis characterizes as a "market equilibrium price." Ex. 15 at 72:2–10, 229:11–17. Dennis then calculated the difference between the starting price of $4.80 and the "market equilibrium price" and labeled that difference the "price premium" associated with the "No Trans Fat" label. Dennis Decl. ¶¶ 44–45; Ex. 15 at 72:12–73:10. For a hypothetical spread priced at $4.80, Dennis calculated a "price premium solely attributable

4

to the 'No Trans Fat' claim" of $1.00 per tub, meaning a $4.80 tub with the "No Trans Fat" label would have to be discounted to $3.80 if it were sold without the "No Trans Fat" label (*i.e.*, the "but-for world"). Dennis Decl. ¶ 49. Dennis testified he did not perform this simulation at any other starting price point. Ex. 15 at 206:15–23 ("I just tested the $4.80 price point.").

Dennis also conducted a separate "consumer perceptions" survey, in which he posed two questions to a different sample of about 500 respondents, each of whom indicated that he or she had bought any spread with one of three heart-healthy messages. Dennis Decl. ¶¶ 25, 53. The first question, the so-called "referendum question," asked respondents to choose between two hypothetical cholesterol-lowering spreads that are "the same in every way except for the presence or absence of the 'No Trans Fat' label." *Id.* ¶ 54. The only difference is that "Product A" was said to "not have [a] 'No Trans Fat' label," and "Product B" was said to "ha[ve] [a] 'No Trans Fats' label." *Id.* The second question in the consumer perceptions survey asked respondents how much trans fat they thought was in a hypothetical cholesterol-lowering spread with a label that says "No Trans Fats." *Id.* ¶ 55. Respondents were given three choices: (i) "Does not contain any Trans Fat," (ii) "Contains a small amount of Trans Fat," or (iii) "Don't know / Not sure." *Id.*

According to Dennis, 88.9% of respondents chose "Product B" in the referendum question, that is, the spread with the "No Trans Fat" label. *Id.* ¶ 56. And 66.8% of respondents responded that a hypothetical spread with a "No Trans Fat" label "[d]oes not contain any Trans Fat." *Id.* ¶ 59. Based on these results, Dennis concluded that "the 'No Trans Fat' and 'No Trans Fatty Acid' labels are substantially material to class members." *Id.* ¶ 17.

## III.    ARGUMENT

### A.    Dennis's Alleged Conjoint Analysis Is Incapable of Estimating a "Price Premium"

Dennis claims his conjoint analysis measures the "price premium" of the allegedly

misleading "No Trans Fat" claim on the Benecol labels, which represents the difference in the price at which class members bought Benecol and the price they would have paid for Benecol in the absence of the allegedly misleading claims. *E.g.*, *id.* ¶¶ 18, 30, 45. ***This is not a generally accepted use for conjoint***, which is understood by experts in the field to be a demand-side tool that is incapable of estimating market prices or market share. Ex. 21 ¶¶ 22–25. Dennis cites one article stating that conjoint is "a generally accepted and commonly used tool in market research to estimate market *demand* for new products and services, among other purposes." Dennis Decl. ¶ 29 & n.5 (emphasis added). But Dennis's key claim is that his conjoint analysis measures much more than ***demand*** in this case; he claims it can measure a difference in ***market price***. He does not cite ***any*** scientific literature that supports the notion that conjoint is an accepted methodology to measure market price or a price premium of a product based on changes in product features. It is not. *See* Ex. 20 ¶¶ 48, 60 (citing conjoint literature); Ex. 21 ¶¶ 22–23 (same).

Regardless, ***Dennis's conjoint does not provide either data point*** needed to calculate overpayment damages[3]: it does not measure (1) what class members ***actually paid*** for Benecol, nor does it calculate (2) what they ***should have paid*** in the absence of the claimed deception, *i.e.*, the "true" market price for Benecol in a world where the label did not say "No Trans Fat."

1.     **Dennis Does Not Consider What Consumers Actually Paid**

A damages methodology is inadmissible under *Daubert* where it has "no discernable … relation to the facts or theories in [the] case." *Gutierrez v. Wells Fargo & Co.*, 2010 WL 1233810, at *7–8 (N.D. Cal. Mar. 26, 2010). Here, Dennis admits that his conjoint analysis does not measure

---

[3] *See Duran v. Henkel of Am., Inc.*, 2020 WL 1503456, at *7 (S.D.N.Y. Mar. 30, 2020) (citing *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015)) ("An actual injury claim under sections 349 [and 350] typically requires a plaintiff to allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.  A plaintiff can show this injury by alleging 'an overpayment,' or 'price premium,' whereby a plaintiff pays more than she would have but for the deceptive practice.").

what individual class members paid for Benecol. Ex. 15 at 279:16–18. In fact, neither Dennis nor Weir proposes any method for doing so. Dennis admits it is possible class members paid disparate prices for Benecol—for instance, as a result of coupons, retailer variation, a "two for one" sale, or "fire sale." *Id.* at 278:22–280:6. And he is clear that his "survey is not intended to speak to individual experiences such as [these] scenario[s]." *Id.* at 280:3–5, 278:9–12.

What's more is that Dennis's "price premium" calculation assumes that all class members paid the same price for Benecol, ignoring a wealth of evidence that class members paid a range of prices for Benecol. Ex. 20 ¶ 115; Ex. 22 ¶ 21. Average weekly prices for Benecol at retail establishments in New York ranged between $3.99 and $7.02. Ex. 22 ¶ 9 & n.9. But Dennis's conjoint analysis does not take this variation into account; instead, it assumes everyone paid the same price. Ex. 20 ¶ 115. Dennis purportedly estimated what the "price premium" would be at exactly one price, $4.80, even though there is no evidence that Chamlin himself ever paid that price.[4] *Id.*; Ex. 17 at 6–7. In reality, Dennis's methodology is invalid and unreliable, so he did not actually measure a price premium even at that price. *See infra*. But regardless, his calculation of a "price premium" at $4.80 says nothing about what the premium would be at other price points. Ex. 20 ¶ 115. In fact, Dennis's own partworth data result in different "price premiums," both in dollar amount and as a percentage of the price, when the simulation is run at different starting price points. *Id.* ¶ 113, Table 3. Simply put, **there is no scientific basis to extrapolate the so-called 20% "price premium" at $4.80 to other price points**, as Weir proposes. Weir Decl. ¶ 44. Dennis's conjoint

---

[4] Neither Joann Martinelli nor Suzanna Bowling, the other plaintiffs represented by Mr. Chamlin's counsel who previously brought similar claims, purportedly paid $4.80 either. Ms. Martinelli claims that she paid "around $4," *see* Ex. 27 at 137:14–22, and Ms. Bowling claimed that she paid $4.89 at Walmart. Ex. 26 at 151:5. This Court denied Bowling's motion for class certification in part because she likely never bought Benecol from Walmart at all, *Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *6 (S.D.N.Y. Apr. 22, 2019) (Nathan, J), and even if she had she likely would have paid only ███████ *See* Ex. 25 & 25-1 at 23.

analysis does not account for the broad range of prices paid by New Yorkers for Benecol during the class period, so it cannot serve as a valid or reliable means of estimating overpayment.

### 2. **Dennis Measures Only Consumer Demand, Not Market Prices**

Apart from failing to account for the prices class members actually paid, Dennis's conjoint analysis also fails to measure what prices they ***should have*** paid. As Dennis acknowledges (Ex. 15 at 256:13–17), prices reflect the intersection of demand (willingness to pay) and supply (willingness to sell). *See In re GM*, 427 F. Supp. 3d at 385 ("Market price … arises from the intersection between supply and demand."). But even a well-designed ***conjoint analysis measures only the demand side of the price equation***—that is, at most conjoint measures consumers' hypothetical reduction in willingness to pay for a hypothetical product. *See id.* at 384 (conjoint "insufficient as a matter of law" to measure market price because "it focuses entirely on consumers' willingness to pay and ignores producers' willingness to sell"). "Without any evidence of the shape of the supply curve … no reasonable jury could determine the price at which the supply and demand curves … intersect—let alone conclude that the price would be lower than the one Plaintiffs paid, resulting in damages." *Id.* Conjoint analysis is simply incapable of measuring what Dennis claims his analysis measures. Ex. 20 ¶¶ 79–85; Ex. 21 ¶¶ 21–26.

For this reason, a growing chorus of courts has rejected conjoint as a means of measuring the "price premium" associated with a product feature. *E.g.*, *In re GM*, 427 F. Supp. 3d at 384; *Beaty v. Ford Motor Co.*, 2020 WL 639408, at *6–7 (W.D. Wash. Feb. 11, 2020) ("The proposed survey does not and cannot account for the *supply side* of the fair market value equation: what a willing seller, under no obligation to sell, would accept."); *Schechner v. Whirlpool Corp.*, 2019 WL 4891192, at *8 (E.D. Mich. Aug. 13, 2019) (rejecting conjoint because "Weir failed to account sufficiently for the market conditions in which a 'Partial-Clean' oven would be sold"); *Visteon Global Techs., Inc. v. Garmin Int'l, Inc.*, 2016 WL 5956325, at *5–7, *19 (E.D. Mich. Oct. 14,

2016) (conjoint analysis excluded because it failed to tie "consumer value" to "the actual incremental value of the … features [at issue] in the real world marketplace"); *In re NJOY, Inc. v. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1120 (C.D. Cal. 2015) (conjoint does not "suffice" as measure of damages because it "completely ignores the price for which [a supplier] is willing to sell its products, what other . . . manufacturers say about their products, and the prices at which those entities are willing to sell their products"); *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) ("By looking only to consumer demand while ignoring supply, Dr. Hay's method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants."); *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 976898, at *11–12 (N.D. Cal. Mar. 6, 2014) (conjoint calculated consumers' "willingness to pay" in a "vacuum" because it did not take into account "the real-world intersection of market demand and market supply").

Dennis admits his conjoint analysis does not account for changes in supply-side factors such as McNeil's costs, competitors' costs, or how McNeil and its competitors would react to a change in how trans fat content is communicated to consumers. Ex. 20 ¶ 78; Ex. 21 ¶¶ 23, 27. For instance, Dennis does not consider whether McNeil would have maintained its prices and sold less, nor does he consider possible competitor responses such as lowering prices in response to changes in Benecol's communications about trans fats, or raising prices due to a perceived market advantage. Ex. 20 ¶ 78. ***Any of these supply-side actions could have influenced the market price of Benecol*** in the hypothetical scenario posited by Dennis's conjoint. *Id.* Yet Dennis admits "[his] survey was not designed to anticipate competitors' reactions to Benecol removing the 'No Trans Fat' label," and that he made no "attempt[] to incorporate or anticipate the reactions of Benecol's competitors or even Benecol itself to change[d] circumstances." Ex. 15 at 270:1–8. That is, Dennis's analysis does not address supply at all. Ex. 21 ¶¶ 20–25.

9

And by failing to account for the supply curve, Dennis rigs his analysis to output the maximum possible "price premium." A market price can be represented as the intersection point between a demand curve, which represents consumers' willingness to purchase, and a supply curve, which represents suppliers' willingness to sell. *See* Figure 1; *see also In re GM*, 427 F. Supp. 3d at 385. The market price P* reflects the profit-maximizing quantity (Q*) at which suppliers will sell a product. *See* Figure 1. Because conjoint cannot account for changes in supply,



Figure 1

Dennis holds the quantity to be "fixed as a matter of history," Dennis Decl. ¶ 46, while allowing the demand curve (willingness to pay) to change freely, Ex. 20 ¶¶ 87–88. In economics terminology, this is known as a "vertical supply curve," where sellers are willing sell a product at any price. *In re GM*, 427 F. Supp. 3d at 386; *see also* Ex. 20 ¶¶ 89–90; Ex. 21 ¶¶ 23, 46–48. In this illustration, the difference between P* and $P^2$ represents the price change if demand shifted downward (*e.g.*, due to declining willingness to pay) and quantity were held fixed (that is, if the supply curve were vertical). It is also the largest possible change in price given the change in demand. But there is no sound basis to assume that McNeil would continue selling the same quantity at a much lower price. More likely, McNeil would have maximized its profits by selling ***less quantity*** of the product at a ***higher price***. Ex. 20 ¶¶ 75–76 & Table 2. As illustrated in Figure 1, $P^1$—not $P^2$—is the new market price that reflects a profit-maximizing quantity resulting from the downward shift in demand.

Recognizing that artificially holding quantity "fixed as a matter of history" would not result in a market price, Judge Furman recently held that a conjoint model ***cannot, as a matter of law, measure "price premium" damages***. *In re GM*, 427 F. Supp. 3d at 388–89. To do so would

"reimagin[e] sellers as conscripted to produce and sell their products at whatever price consumers are willing to pay." *Id.* at 391. Because there zero scientific basis for this foundational assumption of Dennis's conjoint analysis, his testimony should be excluded. *See El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 620–24 (S.D. Tex. 1903) (excluding testimony where expert's "methodology ignores market realities and other externalities").

Dennis and Weir argue, on illogical grounds that were rejected by Judge Furman in *In re GM*, that Dennis's conjoint analysis somehow ***does*** take supply-side factors into account. *First*, Weir contends that the average retail prices inserted into the conjoint survey "reflect how the competitors were behaving in the then extant market conditions." Ex. 16 at 107:15–21. But the basic premise of the conjoint analysis is to hypothesize a ***change*** in those "extant market conditions." Dennis's conjoint survey is designed to measure changes in demand—*i.e.*, willingness to pay in response to different product features—but does not collect or analyze any supply-side information and is not designed to account for changes in supply. Ex. 20 ¶¶ 89–90; Ex. 21 ¶¶ 23, 46–48. Without further data and analysis, a conjoint survey cannot provide the kind of information about supply that could inform a valid estimation of market price. *In re GM*, 427 F. Supp. 3d at 386. *Second*, both Dennis and Weir insist that quantity must be held constant because it is "fixed as a matter of history." Ex. 15 at 250:7–252:25; Ex. 16 at 48:21–49:8. Weir rejects any model or market simulation that could result in "zero … actual economic damages" where quantity changes but not price. Weir Decl. ¶ 33. That is, Weir assumes his own conclusion that there ***is*** a price premium attributable to the "No Trans Fat" label. But "quantity and price go hand-in-hand. An economist ***must consider*** the relationship between willingness to accept and quantity supplied because that relationship *is* the supply curve." *In re GM*, 427 F. Supp. 3d at 385 (emphasis added). Otherwise, the model "blatantly disregard[s] the requirement that diminution-in-value [*i.e.*, price premium] damages must be measured by the difference in market price." *Id.* Because Dennis's

conjoint analysis rests on unsupported assumptions and unscientific extrapolations, it cannot measure any price premium and should be excluded.

### B.   Dennis's Survey Methodology Is Defective and Unreliable

Dennis's expert opinions are also inadmissible under *Daubert* because his survey methodology is so replete with errors that the data cannot be relied upon to support his or Weir's conclusions. An expert's analysis must be "reliable at every step." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 318–19 (S.D.N.Y. 2009). "[A] minor flaw in an expert's reasoning … will not render an expert's opinion per se inadmissible," but opinions must be excluded where "the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* Expert testimony lacks "good grounds" where it is based on a survey that fails to "approximate actual marketplace conditions." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230–31 (S.D.N.Y. 2010). The fundamental defects in Dennis's surveys—the basis of all his and Weir's opinions—render his testimony unreliable and inadmissible.

### 1.   Dennis Surveyed the Wrong Universe of Consumers

"For a survey to be valid, the persons interviewed must adequately represent the opinions which are relevant to the litigation." *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, 2017 WL 1196990, at *29 (N.D. Ill. Mar. 31, 2017); *see also Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 518 (S.D.N.Y. 1993) (citing *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984)) ("To be valid, a survey must rely on responses by potential customers of the products in question."). "Identification of the proper target population or universe is recognized uniformly as a key element in the development of a survey." *Reference Manual on Scientific Evidence* 376 n.76 (3d ed. 2011). "The definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers." *Id.* at 377.

Here, the relevant survey population is Benecol purchasers or potential Benecol purchasers. *See* Mot. for Class Cert. (defining proposed class). Dennis did not target this population; he did not survey Benecol purchasers or even purchasers of competing cholesterol-lowering spreads. Instead, his survey allowed in ***anyone*** who believed he bought a spread sold with one of three "heart healthy" messages on its label: (1) "Lower or reduce cholesterol," (2) "Support healthy cholesterol levels," or (3) "Helps maintain a healthy heart." Dennis Decl. ¶ 25. Dennis said he ***expected*** the respondents to include purchasers of the three cholesterol-lowering brands he was targeting. Ex. 15 at 98:7–13. But he ***never asked*** any respondents what brands they bought, and so he has no way to tell how many of his survey respondents (if any at all) bought Benecol or other cholesterol-lowering spreads. *Id.* at 170:15–22. Many spreads were sold with "heart healthy" messaging that were ***not*** "neutraceuticals" with clinical medical benefits like Benecol. *Id.* at 172:15–177:3; *see* Opp. to Mot. for Class Cert. at 3. For example, Smart Balance Original claims it "supports healthy cholesterol levels," but does not contain plant sterols and does not purport to lower cholesterol.[5] Dennis provides no reason to believe that buyers of any "heart healthy" spread would be representative of consumers who bought Benecol, the defining feature of which is that it actively ***lowers*** cholesterol. Ex. 20 ¶¶ 133–34. Dennis admits there was a clear "risk" that individuals who ***never*** bought a cholesterol-lowering spread "would get in the survey." Ex. 15 at 176:3–22. And ***his own "pre-interviews" confirmed that he sampled an overbroad and unrepresentative group***: most of the interviewees indicated they bought Smart Balance or other brands that are not cholesterol-lowering spreads like Benecol. Ex. 18; Ex. 15 at 170:1–22.

Courts have repeatedly excluded expert testimony where the expert surveyed the wrong population. For example, in *Cumberland Packing Corp. v. Monsanto Co.*, the court excluded as

---

[5] *See* Smart Balance, https://www.smartbalance.com/buttery-spreads-sticks/smart-balance-original.

"unreliable" a survey that used an overbroad population. 140 F. Supp. 2d 241, 245 (E.D.N.Y. 2001). The "relevant universe" in that case was "people with a current interest in purchasing an aspartame-based sugar substitute," but the surveyed population included any "users or buyers of sugar substitutes within the past six months." *Id*. Similarly, in *1-800 Contacts, Inc. v. Lens.com, Inc.*, 2010 WL 5186393, at *6–7 (D. Utah Dec. 15, 2010), the court excluded a survey that included anyone who bought or intended to buy contacts, where the relevant universe was "consumers *who purchase contacts on the Internet*." *Id.* at *6 (emphasis in original). Since the survey was not limited to "those who purchased contacts on the Internet," the court concluded that the "survey universe was improper." *Id*. at *6–7. Here, the relevant population is people who bought Benecol or at least were in the market for a cholesterol-lowering spread. Yet because he failed to ask about or screen for brand, Dennis has no idea who took his survey, much less whether they represent the relevant population. He therefore has not shown his survey results can be extrapolated to the putative class. Both his surveys used the same screening criteria for the survey population, *see* Dennis Decl. ¶¶ 23–25, and so both surveys are unreliable and should be excluded.

### 2. The Implausible Partworths and Price Premiums that Dennis Calculated Make No Sense and Defy Basic Economic Principles

There is no better evidence that Dennis's conjoint methodology is more irredeemably flawed than the data and calculations in the conjoint analysis itself.

*First*, Dennis's data make no sense even on their own terms: the partworth data derived from the survey responses ***reveal illogical preferences for higher prices over lower prices***. In his market simulation, Dennis artificially constrained the estimated partworths for the price attribute to be "monotonic," meaning that Dennis disregarded respondents' actual answers, if necessary, to ensure that the resulting partworth estimates conform to the economic principle that consumers prefer low prices over high prices. Ex. 20 ¶¶ 99–100. In other words, Dennis ignored answers when

14

they made no sense—as he did for a large portion of the responses. When Reibstein scrutinized the partworths calculated by Dennis, it appeared that *nearly half* of the respondents' partworth utilities reflected a preference for higher prices over lower ones, all else being equal. *Id.* That is, according to the partworths Dennis calculated, almost half of respondents, if faced with the choice of two products that are identical except that one is more expensive, *would choose the more expensive product*. Such irrational preferences likely do not reflect reality and demonstrate the invalidity and unreliability of Dennis's conjoint analysis. *Id.* ¶ 100.

*Second*, Dennis's analysis estimates "price premiums" for each of the tested label descriptions that, when added up, *exceed the retail price of Benecol*. Dennis touts his measured price premium as the "percentage or amount of the sales price that is solely attributable to the challenged claim." Dennis Decl. ¶ 45. Accepting that premise as true, the combined price premiums for each of the product's features should sum up to 100% of the sales price. Yet when Reibstein reconstructed Dennis's data and used his methodology to calculate price premiums for other features that Dennis surveyed, the total price premiums quickly add up to exceed the total retail price of Benecol. Ex. 20 ¶¶ 108–10. For example, the price premiums for only 5 of the 15 attributes that Dennis measured add up to $4.96—sixteen cents more than the $4.80 price used in Dennis's analysis. *Id.* ¶ 108. And this is *before* one takes into account features that Dennis excluded from his survey that consumers actually value: brand, taste, texture, and efficacy in reducing cholesterol.[6] *Id.* ¶ 109; Ex. 23 at Ex. 7-2. Because those product features are more important to consumers, one would expect them to have outsized price premiums that, in Dennis's analysis, would lead to a total product price that far exceeds the $4.80 market price. *Id.* This result

---

[6] Notably, the price premium associated with the "Proven to Reduce Cholesterol" label description "exceeded the range of prices tested by Dr. Dennis and accepted by his simulator." Ex. 20 ¶ 108 n.208.

is absurd, and it discredits Dennis's interpretation of his own conjoint results. *Id.* ¶ 110.

The sheer implausibility and illogic of the data collected by Dennis's conjoint survey demonstrate that Dennis did something seriously wrong in designing his conjoint analysis, and that it is completely unreliable as a measurement of injury or damages in this case. *See Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013) ("[I]nadequacies [with survey methodology] speak not merely to the weight that should be accorded the survey, but rather to the fundamental reliability of [it].").

### 3. Dennis's Conjoint Survey Measured How Respondents Value Obscure Features That Do Not Drive Real-Life Consumer Purchases

One reason why Dennis's conjoint results make no sense may be that the conjoint survey itself failed to simulate how people decide to buy Benecol. A conjoint analysis can estimate actual market behavior only if the conjoint survey itself resembles real-life decision-making about products. Ex. 20 ¶¶ 59–61.[7] For a conjoint to be accurate and reliable, it is essential that tested features and all the other attributes used in the survey represent the features or purchase drivers that actually influence sales. *See id.* ¶¶ 48–67. Otherwise, the conjoint "forces respondents to make decisions in the absence of information that drives their purchase decision in the real world," which "provides little information about consumer behavior in the marketplace." *Id.* ¶ 68.

Far from focusing on purchase drivers, Dennis's conjoint focused respondents on minor features that were irrelevant to many Benecol buyers' purchases, such as tub size, plant stanol esters versus plant sterols, and vegetable oil percentage. Dennis Decl. ¶ 33. ***Dennis knew these features were unimportant to buyers***—not a single person he interviewed to help inform his

---

[7] Dennis testified that he is familiar with the literature on conjoint analysis that states: "[S]election of attributes and levels is a very crucial step in the design of conjoint studies. . . . The scientific aspects [of this step] arise from an understanding of the consumer's choice process, more specifically salient attributes involved in the choice of an alternative by a majority of target consumers." Ex. 15 at 73:15–76:3.

survey design indicated that one of these features was important. Ex. 15 at 161:24–165:16; Ex. 18. Indeed, McNeil's survey of Benecol buyers asked them to list the reasons why they bought Benecol, and zero of 300 respondents mentioned "tub size" or "vegetable oil percentage." Ex. 23 ¶¶ 27–30. Only one respondent mentioned trans fat. *Id.* Instead, respondents focused on factors excluded from Dennis's survey: taste, lowers cholesterol, consistency, and so forth. *Id.*; Ex. 20 ¶¶ 50–58.

Dennis's methodology thus caused an artificial increase in respondents' willingness to pay—a phenomenon called "focalism bias" in which the importance of a single element of an experience or product is magnified in order to draw respondents' attention where it may not otherwise have been but for the survey's methodology. Ex. 20 ¶ 66. Because Dennis stacked his conjoint survey with obscure and unimportant features, respondents placed an artificial and inflated value on the tested "No Trans Fat" claim. *Id.* ¶ 104.

The reason the tested feature itself must be one that would typically factor into a consumer's purchase decision is because a conjoint survey, by its nature, requires respondents to understand the various features they are trading off. *See id.* ¶ 60. Multiple courts have rejected conjoint as a reliable form of analysis where it tests respondents' valuation of minor or unimportant features. *E.g.*, *Saavedra*, 2014 WL 7338930, at *4 (infrequent discontinuation symptoms of prescription antidepressant); *Apple, Inc.*, 2014 WL 976898, at *11 (touch screen hand gestures); *Visteon*, 2016 WL 5956325, at *5–7, *19 (menu and display options on navigation device). By omitting major features, Dennis's survey does not simulate real purchase decisions and the results of that survey cannot be relied upon to determine how consumers would behave in a marketplace.

4.   **Dennis's "Consumer Perceptions" Survey Is Too Detached from Reality to Measure Anything Meaningful about Materiality**

In addition to the conjoint survey, Dennis conducted a "consumer perceptions" survey that

asked a different group of respondents two questions: a "referendum question" comparing spreads that have or do not have a "No Trans Fat" label, and a question about how respondents interpret the phrase "No Trans Fat." Dennis Decl. ¶¶ 53, 55. Neither question elicits any useful information about what class members consider material for their purchases; in fact, these questions are so biased that they cannot support any conclusion, one way or the other, about whether the "No Trans Fat" label is material to consumers as Dennis contends.

Apart from surveying the wrong population, discussed above, the consumer perceptions survey deprives respondents of key information they would normally rely upon as consumers. The referendum question presented ***no information at all*** about the hypothetical products but for the presence or absence of a "No Trans Fat" label. Ex. 20 ¶ 120.This artificial choice forces them to make a decision without the benefit of much of the information that consumers actually rely upon in making purchase decisions, such as brand, price, or product packaging. *Id.* Likewise, the consumer perception question isolates one phrase from the label and forces respondents to answer the question without the benefit of the context and information that is presented elsewhere on the Benecol label. *Id.* ¶¶ 120–24. In the real world, consumers rely on the totality of information, both textual and graphical, that is present on product labels. *Id.* Dennis withheld that information from respondents and made them rely solely on the words "No Trans Fat"; their responses cannot be used to draw conclusions about how consumers make decisions in the real world. *Id.*

In addition, Dennis's survey questions are designed to bias the responses. By calling out the "No Trans Fat" claim in such an obvious manner, they "cause the subject to perceive, interpret, and act upon what he believes is expected or desired of him by the experimenter." *Id.* ¶ 125. Both questions focus respondents' attention on the "No Trans Fat" claim and force them to make a decision based solely on that phrase in isolation. *Id.* ¶¶ 125–29. It is obvious to the respondent what the object of the survey is—by telling respondents the survey is about spreads that "claim to

18

lower cholesterol or support healthy levels of cholesterol" and instructing them that such spreads are "different from other kinds of spreads," Dennis magnifies the importance of any claims on the product label. *Id.* ¶ 127. And by design, the only claim on the label mentioned in these questions is the "No Trans Fats" claim. The blatant problem with bias in Dennis's consumer perceptions survey renders it invalid and unreliable.

### C. Weir's Report Is Inadmissible For Multiple Reasons

Weir's opinions fall into three groups: (1) he says Dennis's conjoint analysis is "reliable" and "accurate"; (2) he suggests that retail prices in competitive markets are the result of consumer willingness to pay rather than supply-side conduct; and (3) he multiplies Dennis's "price premium" by the quantity of Benecol sold to arrive at a purported calculation of classwide damages.

None of these opinions is admissible expert testimony.

#### 1. Weir's Endorsement of Dennis's Conjoint Analysis Is Inadmissible

Much of Weir's report is spent repeating Dennis's description of conjoint methodology and summarizing Dennis's declaration. Weir then states that "the results of the [conjoint] survey provide a reliable and accurate measurement of the market price premium solely attributable to the challenged claims … ." Weir Decl. ¶ 26; *see also id.* ¶¶ 14–25.

Weir did not meaningfully participate in Dennis's conjoint analysis. Dennis himself testified that Weir had limited involvement in the survey design, and Weir admitted that he knew few of the details of the conjoint design. *See, e.g.*, Ex. 15 at 28:1–10, 32:22–33:2; *see also* Ex. 16 at 102:21–23 ("Q: And where did the list of distractor attributes come from? A: You would have to ask Dr. Dennis."); *id.* at 107:22–25 ("Q: Did understanding who the competitors were have any impact on survey design, to your knowledge? A: You would have to ask Dr. Dennis."). Dennis testified that he explained his survey design to Weir, who simply "concurred that [Dennis] had a reasonable conjoint design." Ex. 15 at 31:9–13. Indeed, Weir appears to have made only one

substantive contribution to Dennis's conjoint design: he suggested using $4.80 as Benecol's price

point based on market data that McNeil had produced. *Id.* at 29:19–30:2; *see also* Ex. 16 at 97:7–

13 (Weir "provided Dr. Dennis with … inputs" in the form of retail price information, "then Dr.

Dennis took that information and designed the remainder of the survey . . . ."). And even with this

purported contribution, Dennis and Weir "came to this [price] together" based on their shared

"access to the same definite market research." Ex. 15 at 30:8–10; Dennis Decl. ¶ 46 & n.14 ($4.80

price point is based on ███ per ounce, which is listed as a price point for Benecol in a document

that McNeil produced in discovery). Besides this $4.80 price figure, nothing that Weir claims to

have discussed with Dennis had any tangible impact on the actual survey design. Ex. 15 at 32:22–

33:2; Ex. 16 at 97:7–13 ("I … provided Dr. Dennis with the inputs ... . And then Dr. Dennis took

that information and designed the remainder of the survey.").

> ***First***, Weir's opinions about Dennis's conjoint are duplicative. Courts properly exclude

testimony on topics that are already the subject of another expert's testimony. *See, e.g.*, *F.H. Krear*

*& Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1258 (2d Cir. 1987) (affirming district court's

exclusion of expert testimony as cumulative where at least four other witnesses testified on the

same subject).[8] In *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 949–52 (C.D. Cal. 2015), for

example, an expert vouched for another expert's proposed survey through a declaration in support

---

[8] *See also, e.g.*, *Price v. Fox Ent. Grp., Inc.*, 499 F. Supp. 2d 382, 390 (S.D.N.Y. 2007) (excluding expert testimony where there was "substantial overlap between the reports and there is absolutely no need for both experts to testify"); *Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 729 (E.D.N.C. 2007) (wholesale adoption of the opinion of another expert is not "within the intent of Fed. R. Evid. 702"). Where an expert merely vouches for another expert's opinion, as Weir does here, that expert's testimony is cumulative. *See, e.g.*, *F.H. Krear & Co.*, 810 F.2d at 1258; *Hartle v. FirstEnergy Generation Corp.*, 7 F. Supp. 3d 510, 525–26 (W.D. Pa. 2014) (excluding expert opinion that "vouch[ed]" for another expert); *Tunis Bros. Co. v. Ford Motor Co.*, 124 F.R.D. 95, 98 (E.D. Pa. 1989) ("Merely to have partisan experts appear to vouch for previous experts violates Fed. R. Evid. 403 and would needlessly present cumulative evidence, waste time, and mislead the jury.").

of class certification. The court could not "credit her conclusory assertion that the methodology of the survey [was] reliable" because "she did not participate in designing or administering the survey." *Id.* at 951–52. This case presents a similar situation. While Weir dedicates pages of his report to describing facts or issues he contends Dennis "considered" in designing the conjoint analysis, Dennis contradicted Weir's testimony about the scope of Weir's purported "involvement" in the survey: Dennis testified that Weir "ha[d] no role" in "the survey execution," Ex. 15 at 27:16–17, while Weir vaguely claimed to have "worked with Dr. Dennis to design and execute" the conjoint analysis, Ex. 16 at 27:1–28:9. At most, Weir's role in designing the survey was limited to feeding Dennis prices drawn directly from the Defendants' document production. Ex. 15 at 28:5–10. That is, Dennis designed the conjoint analysis entirely, with Weir merely providing "price points" to plug into the survey. *Id*. at 27:13–28:10, 32:16–33:2. Weir's declaration should thus be excluded. *See In re ConAgra,* 90 F. Supp. 3d at 951–52 (excluding expert's "conclusory assertion that the methodology of [another expert's] survey is reliable").

**Second**, Weir's opinions that Dennis's conjoint survey is "reliable," or that "a defendant engaged in a litigation" has "obvious conflicts of interest" that would make it unfair for it to "simply postulate its way out of economic damages," invading the province of the Court. Weir Decl. ¶¶ 26, 33. Weir is not the judge; it is the Court's role to determine whether Dennis's conjoint is based on sound methodology or which of McNeil's defenses are valid. *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993) (the trial court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue"). Weir's testimony is independently inadmissible for this reason.

**Third**, Weir's opinions are derivative of Dennis's separately inadmissible opinions.  Weir's endorsement of those same opinions is irrelevant and likewise inadmissible. *Assured Guar. Mun.*

*Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 486–87, 500, 504 (S.D.N.Y. 2013) (where loan underwriting expert's opinions were inadmissible, opinions of two other experts, who relied on her "defective loan findings" in performing statistical sampling and damages calculations, "would be irrelevant"); *see also In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724, 747 (N.D. Ohio 2014) (expert's opinions "moot" to the extent those opinions "merely evaluate[d] the work of other experts" that court excluded). To the extent the Court excludes Dennis's testimony, Weir's testimony must be excluded as well because permitting testifying experts to "describe" an excluded witness's opinions "would be to allow through the back door testimony that could not enter through the front door." *See, e.g.*, *Columbia Grain, Inc. v. Hinrichs Trading, LLC*, 2015 WL 6675538, at *4–5 (D. Idaho Oct. 30, 2015).

### 2. Weir Is Not Qualified to Testify on Retail Pricing, and His Opinions on That Subject Are Unreliable

The lynchpin of Weir's opinion extrapolating the results of Dennis's conjoint analysis to *all* Benecol purchases is his contention that retailers "adjust prices in response to changing economic conditions and consumer preferences" to reach a "market clearing" price. Weir Decl. ¶¶ 32, 40. In this way, he contends, retail prices reflect consumers' willingness to pay. *See id.*[9] This opinion has no basis in the reality of how retailers have set prices for the past 20 years. And indeed, Weir has no relevant experience that would qualify him to offer this opinion.

Although Weir speaks of a "market clearing" price, what he actually describes is an "inventory clearing" price. That is, Weir imagines a retailer slashing prices as low as necessary to sell whatever inventory of Benecol it has, at any price it can fetch, in the same manner that a grocer might discount meat that is set to expire in the next few days. Ex. 16 at 173:16–174:14. In this

---

[9] *See also* Ex. 19 ¶ 45 ("[R]etailers most certainly would adjust their prices in response to changes in consumer demand. … [R]etail groceries would be motivated to sell Benecol at below cost to its customers in response to consumer demand, rather than obtain no revenue at all.").

way, Weir contends that, once the supposed deception from the "No Trans Fat" claim is revealed, consumers would be less willing to pay the shelf price, forcing retailers to discount the product to eliminate the "price premium" associated with that claim. *See id.* (stating retailers will "discount" a "can of beans" that is "defective" in that "the bean company lies"). Not only is this testimony belied by the historical retail prices for Benecol, Ex. 21 ¶ 40, but the processes and mechanisms that Weir describes reflect a complete lack of understanding of how retailers set prices. Ex. 22 ¶¶ 17–20. At least for goods with long shelf lives such as Benecol, grocery stores do not price products to clear inventory. *Id.* ¶ 28. On the contrary: retailers used automated replenishment systems to achieve a ***constant*** level of inventory—not empty their shelves. *Id.* Further, grocery retailers do not base prices on their assessment of consumer demand or willingness to pay; instead, they change prices weekly in response to vendor/manufacturer promotions and to match (or establish a tolerable gap with) a leading competitor. *Id.* ¶¶ 24–26.

The sole other basis Weir offers for his retail pricing opinions are excerpts from a handful of grocery stores' SEC filings about conditions that impact their businesses. Weir Decl. ¶ 40. These general statements about how the retail sector is "competitive" do not support Weir's opinions, as they say nothing about ***how*** retailers make pricing decisions or respond to competitive pressures.

In short, there is no sound basis, whether in economics or pricing strategy, for Weir's opinion that retail prices are aligned with consumer willingness to pay—which is the basis for his conclusion that Dennis's "price premium" applies to all class members. *Id.* ¶ 44 ("Just as a rising tide lifts all boats, a reduction in demand reduces prices market-wide. This is why the price premium percentage calculated by Dr. Dennis applies to all Class Members market-wide regardless of the absolute price they paid … .").

It's no surprise Weir's opinions are unfounded in reality—he has no relevant experience that qualifies him to testify on how retailers set prices for Benecol in 2008–2011. Weir asks the

Court to accept his say-so because he used to work at Stop & Shop, Weir Decl. Ex. 1; Ex. 16 at 81:8–10, and because he has experience conducting unspecified "analy[ses]" on the "retail sales of [unspecified] products." Ex. 16 at 78:13–81:7. But none of that experience qualifies him to testify about how *all* grocery store retailers priced products during the relevant period. The retail sector is rapidly evolving, and several important developments over the past 20 to 30 years have drastically changed retailers' pricing strategies and practices. Ex. 22 ¶ 17. Weir's anecdotal experience as a Stop & Shop employee years before the class period even began[10] provides no basis to opine on any other retailer's pricing practices during the class period. *See Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 481–82 (S.D.N.Y. 2000) (excluding expert's analysis as "largely anecdotal" and did "not rely upon any particular type of expertise that would assist the trier of fact"). Weir simply lacks any qualification or other basis for his opinions on retail pricing. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 359–60 (2d Cir. 2004) (*Daubert* analysis was "almost superfluous" in light of expert's "meager qualifications to offer opinions as to automobile design" where he "had only a bachelor's degree in engineering and his only practical experience was in designing parts for automobile air bags," and "[o]ther than that, his employment has consisted entirely of consulting for purposes of litigation").

### 3.   Weir's "Damages Calculation" Is Basic Multiplication

Weir's remaining opinion is simple math, not expert testimony. Expert testimony needs to help "the trier of fact to understand the evidence or to determine a fact in issue" through the expert's "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "An expert is precluded from offering testimony that is not based on any specialized knowledge, but rather involves 'basic calculations.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 56 (S.D.N.Y.

---

[10] *See* Weir Decl. Ex. 1 at 3 (ETI employed Weir by no later than August 2005); Stop & Shop, https://stopandshop.com/pages/about-us (Stop & Shop acquired by Royal Ahold NV in 1996).

2016) (citing *Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000)).[11]

As this Court has found, "analysis and extrapolation of data [that] could easily be run by plaintiffs themselves ... is not expert analysis." *Id.* Here, even Weir admits that his formulas are "simple and straightforward." Weir Decl. ¶ 51; *see also* Ex. 16 at 192:21–23 ("I certainly hope that the judge or the jury would be capable of the multiplication."). Indeed, he merely multiplies the percentage of diminution in value that Dennis purports to calculate by the total dollar sales of Benecol. Weir Decl. ¶ 52. ***That basic calculation is the totality of Weir's damages framework.*** *Id.* Weir tries to claim that his opinions are more complex because he "pulled the sales data together" and "add[ed] up the ... sales data from a number of different data sources" to perform that calculation. Ex. 16 at 192:5–7, 193:3–4. But Weir simply tallied up sales data from a handful of spreadsheets produced by McNeil, then performed, in his own words, a "simple and straightforward" calculation, which any reasonable layperson could do. Weir Decl. ¶¶ 51, 54 & Table 2. Weir's "simple and straightforward" calculation should be excluded.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude the opinions of Plaintiff's experts J. Michael Dennis and Colin Weir.

---

[11] *See also Cincinnatus Partners I, LP v. Farm Bureau Prop. & Cas. Ins. Co.*, 2014 WL 12748899, at *2 (S.D. Ohio May 28, 2014) ("Expert testimony is not needed where the subject matter of the testimony is a 'matter of arithmetic 'within the capacity of any reasonable lay person.'") (citing *United States v. Madison*, 226 F. App'x. 535, 543–44 (6th Cir. 2007)); *Jones Creek Investors, LLC v. Columbia County*, 2013 WL 12141348, at *19 (S.D. Ga. Dec. 23, 2013) (excluding damages expert opinions as "mere[ ] recitations of opinions and information held by other witnesses and the application of simple arithmetic"); *Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*, 398 B.R. 564, 576–77 (Bankr. E.D. Mich. 2008) (concluding that an expert's testimony was inadmissible when he "applied very simple math"—addition and division—to assumed values: "[T]he Court could have performed those same calculations" and "[a]ny reasonably (or even minimally) educated lay person could do them").

Date:    September 25, 2020            Respectfully submitted,
          New York, New York

/s/ *Hannah Y. Chanoine*
Hannah Y. Chanoine
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
hchanoine@omm.com

Richard B. Goetz (*pro hac vice*)
Carlos M. Lazatin (*pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
E-mail: rgoetz@omm.com

*Counsel for Defendants Johnson & Johnson and McNeil Nutritionals, LLC*